**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**May 20, 2004**

Charles R. Fulbruge III
Clerk

Revised May 26, 2004

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 03-20687

———————————

JOSE ERNESTO MEDELLIN,

Petitioner-Appellant,

v.

DOUG DRETKE, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

————————————————————————————————

Appeal from the United States District Court for the
Southern District of Texas

————————————————————————————————

Before JONES, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM:

Petitioner Jose Ernesto Medellin, a citizen of Mexico, was convicted of capital murder in Texas state court and sentenced to death. Medellin filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 2254. The district court denied the petition. The district court also, *sua sponte*, denied Petitioner a certificate of appealability ("COA"). Petitioner now requests a COA from this Court pursuant to 28 U.S.C. § 2253(c)(2). For the following reasons, Petitioner's Application for a Certificate of Appealability from Denial of a Petition for Writ of Habeas Corpus is denied.

# I. BACKGROUND

On June 24, 1993, Petitioner, along with fellow gang members, raped and killed two teenage girls whom the gang happened across after a gang initiation. Petitioner raped both girls and helped to murder at least one of the girls by holding one end of the shoelace used to strangle her.

After Petitioner was convicted of this crime and his sentence was imposed, the Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal. Petitioner did not seek certiorari in the Supreme Court of the United States.

Petitioner subsequently filed a state application for a writ of habeas corpus. Without holding an evidentiary hearing on Petitioner's claims, the state trial-level habeas court recommended to the Texas Court of Criminal Appeals that Petitioner's application be denied. The Texas Court of Criminal Appeals agreed and denied Petitioner's application.

Petitioner filed a preliminary federal petition for a writ of habeas corpus in November 2001. Petitioner amended his petition in July 2002. As previously noted, the district court denied relief and also denied Petitioner a COA. Petitioner filed a timely notice of appeal. Petitioner now seeks a COA raising six claims, all of which were properly raised in the district court.

Petitioner alleges four grounds for relief based upon ineffective assistance of counsel. Petitioner alleges that his trial counsel was ineffective at the sentencing stage of his trial for failing to present evidence that Petitioner complied with his probation officer while on probation as a juvenile. Relatedly, Petitioner alleges that his trial counsel was ineffective at the sentencing phase of his trial for declining to inform the jury that Petitioner would have been eligible for parole after serving thirty-five years if he had been sentenced to life imprisonment. Petitioner also avers that his counsel on direct appeal was ineffective for failing to seek the enforcement of the state trial court's

order purporting to preclude the state from seeking the death penalty. Finally, Petitioner claims that his appellate counsel was ineffective for not properly raising a *Batson* claim on direct appeal.

The remaining two grounds that Petitioner urges in support of his petition are that the state violated his rights as a foreign national to consular access under the Vienna Convention and that the state failed to disclose exculpatory information to defense counsel.

## II. STANDARD FOR GRANTING A COA

Medellin filed his Section 2254 petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The petition, therefore, is subject to the procedures imposed by the AEDPA. *See Lindh v. Murphy,* 521 U.S. 320, 336 (1997).

Under the AEDPA, a petitioner must obtain a COA before an appeal can be taken to this Court. *See* 28 U.S.C.A. § 2253(c)(2) (West 2003); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."). "[W]hen a habeas applicant seeks permission to initiate appellate review of the dismissal of his petition, the court of appeals should limit its examination to a threshold inquiry into the underlying merit of his claims." *Miller-El*, 537 U.S. at 327. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id*. at 336.

A COA will be granted if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2) (West 2003). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. "The question is the debatability

of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id*. at 338. Finally, "[b]ecause the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [Petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

We note that under the AEDPA, federal courts are to give a level of deference to state court findings per §§ 2254(d)(2) and (e)(1). At the COA stage, however, "we only ask whether the District Court's application of AEDPA deference, as stated in §§ 2254(d)(2) and (e)(1), to [a] claim was debatable amongst jurists of reason." *Miller-El*, 537 U.S. at 341.

### III. ANALYSIS

#### a. Ineffective assistance of counsel

To prevail on a claim of ineffective assistance of counsel, Petitioner must show (1) that his counsel's performance was deficient, and (2) that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 689-94 (1984). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 123 S. Ct. 2527, 2535 (2003) (quoting *Strickland*, 466 U.S. at 688). "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 2542 (quoting *Strickland*, 466 U.S. at 692).

With the *Strickland* framework in mind, we turn to Petitioner's specific ineffective assistance claims.

4

*1.Evidence that Petitioner complied with his probation as a juvenile*

The jury found that Petitioner posed a future danger, one of the special findings required for imposition of a death sentence in Texas. Petitioner argues that his trial counsel was ineffective at the punishment stage of his trial for failing to investigate and present evidence of Petitioner's compliance with his probation officer while he was on probation as a juvenile. Petitioner necessarily alleges that this purported failure prejudiced him at the sentencing phase of his trial because the evidence would have shown that he did not pose a future danger.

The district court noted that Petitioner presented only hearsay evidence, in the form of an affidavit, that Petitioner's probation officer would testify that Petitioner satisfied his juvenile probation. Nonetheless, the district court addressed the merits of Petitioners claim and agreed with the state habeas court that Petitioner was not prejudiced even if his counsel was deficient. Because we find the district court's holding in this respect not debatable, even upon a threshold review, we may not issue a COA as to this claim.

Assuming that Petitioner's juvenile probation officer would have testified that Petitioner was a model probationer, Petitioner's own acts after he completed his juvenile probation belie a conclusion that he would not pose a threat of future dangerousness when in a supervised, structured environment. Putting aside the fact that Petitioner fell back into gang activity after completing his juvenile probation, ultimately leading to the horrific crime for which he was sentenced to death, Petitioner clearly indicated his continuing dangerousness while in prison awaiting trial. On two separate occasions while Petitioner was in the Harris County jail awaiting trial, Petitioner was found to have hidden shanks in his cell. One cannot reasonably fathom how the fact that Petitioner once complied with probation as a juvenile rebuts the overwhelming

5

evidence that Petitioner posed a future danger.  Nothing that his probation officer may have said could have conceivably caused the jury to decide the question of Petitioner's future dangerousness in Petitioner's favor.   Accordingly, it is not debatable that Petitioner was not prejudiced by his probation officer not testifying.  Absent prejudice, Petitioner's claim fails the second *Strickland* prong. A COA may not issue as to this claim.

### 2. *Evidence of Petitioner's eligibility for parole if he were not sentenced to death*

Petitioner argues that his trial counsel was ineffective because counsel declined to inform the jury pool that, if sentenced to life imprisonment rather than death, Petitioner would be eligible for parole in thirty-five years.  Though the trial court need not instruct the jury regarding a defendant's eligibility for parole, *see Tigner v. Cockrell*, 264 F.3d 521, 525 (5th Cir. 2001), the judge presiding over Petitioner's trial nonetheless indicated that she would allow Petitioner to inform the jury that, if sentenced to life, he would not be eligible for parole for thirty-five years.

In declining to inform the jury of Petitioner's eligibility for parole if sentenced to life imprisonment, Petitioner's trial counsel indicated that, based upon his past experience in death penalty trials and his own polling of juries, jurors thought life imprisonment meant no parole.  He preferred to let the jury assume that Petitioner would not be eligible for parole.

In an attempt to show that his trial counsel's decision was objectively unreasonable, thereby meeting the first *Strickland* prong, Petitioner points to studies showing that members of the public underestimate the amount of time a convict will serve when sentenced to life imprisonment.  Petitioner claims that when presented with the opportunity to inform the jury that Petitioner would not be eligible for parole before he had served thirty-five years of a life sentence, his trial counsel should have taken the opportunity.

6

"In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative." *Simmons v. South Carolina*, 512 U.S. 154, 168 (1994). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)). Even if we were to review *de novo* the trial defense counsel's reasons for not informing the jury of Petitioner's potential eligibility for parole, we could not say the decision was objectively unreasonable. No reasonable jurist would debate that trial counsel's decision was so ill chosen that it permeated the entire trial, or even just the sentencing phase, with obvious unfairness.

Indeed, pointing out to the jury that Petitioner would be eligible for parole at age 53 could not conceivably have changed their determination that Petitioner posed a future danger. *See Woods v. Johnson*, 75 F.3d 1017, 1037 (5th Cir. 1996); *King v. Lynaugh*, 850 F.2d 1055, 1060 (5th Cir. 1988). Petitioner fails to meet either *Strickland* prong. Accordingly, the district court's application of AEDPA deference to the state habeas findings is not debatable. A COA may not issue as to this claim.

*3. Failure to raise on appeal the state trial court's alleged order precluding the death penalty*

Petitioner argues that his counsel on direct appeal was ineffective because counsel did not seek to enforce on appeal an order entered by the state trial court indicating that the state could not seek the death penalty. Petitioner made a motion prior to his trial to preclude the state from

7

seeking the death penalty. In a pretrial conference, the state trial court indicated that it would deny Petitioner's motion. When the written order was issued, however, the judge signed on the line indicating that Petitioner's motion was granted. Of course, the trial continued and a death sentence was sought and obtained. Nothing was made of the order until Petitioner's state habeas proceedings.

At the state habeas proceedings, the state trial judge, the same judge who tried the case, indicated that she inadvertently signed the line granting Petitioner's motion to preclude the state from seeking the death penalty. The fact that the issuance of the written order was an inadvertence is self-evident. The trial judge, in fact, allowed the state to seek the death penalty. Petitioner offers nothing to contradict the pre-trial announcement by the district court that it would deny the motion and judge's personal recollection that she intended to deny his motion and that she inadvertently signed the wrong line.

Our Court decided a similar issue in *Riley v. Cockrell*, 339 F.3d 308 (5th Cir. 2003). At the state trial at issue in *Riley*, another Texas death penalty case, the defendant moved to dismiss the indictment against him. Despite verbally indicating that the court would deny the claim, the judge checked the space on the written order indicating that the motion was granted. The case went ahead to trial where the defendant was convicted and sentenced to death. The issue was raised during the state habeas proceedings before the same judge who had tried the case. The judge indicated that the order was entered inadvertently. The judge entered a *nunc pro tunc* order denying the petitioner's claim. Our Court ultimately held that the issuance of the *nunc pro tunc* order fixed any problem with the indictment and, therefore, held that it was not debatable whether petitioner could be granted relief on the claim. *Riley*, 339 F.3d at 313-15.

8

Even if Petitioner's counsel on direct appeal had raised the issue, and if we assume the state appeals court would have found it sufficient to warrant remand for entry of a *nunc pro tunc* order, a proposition we strongly doubt, we have no doubt that Petitioner's death sentence would not have been vacated based upon this claim. At best (from Petitioner's point-of-view), raising the issue on direct appeal would have led to the ultimate entry of a *nunc pro tunc* order retroactively denying Petitioner's motion. He would be in exactly the same position he is in now. Therefore, Petitioner was in no way prejudiced by his counsel's failure to raise this issue on direct appeal. No reasonable jurist would debate this point. We may not, therefore, issue a COA as to this claim.

### *4. Failure to properly appeal the state's use of peremptory jury strikes*

"Since [Petitioner's] claim rests on a *Batson* violation, resolution of his COA application requires a preliminary, though not definitive, consideration of the three-step framework mandated by *Batson* and reaffirmed in our later precedents." *Miller-El*, 537 U.S. at 340. "Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767 (1995). "In the context of the threshold examination in this *Batson* claim the issuance of a COA can be supported by any evidence demonstrating that, despite the neutral explanation of the prosecution, the peremptory strikes in the final analysis were race based. It goes without saying that this includes the facts and circumstances that were adduced in support of the prima facie case." *Miller-El*, 537

9

U.S. at 340.

On direct appeal, Petitioner claimed that the state violated *Batson* by striking two particular jurors. On federal habeas, this claim has been broadened to allege that the state's use of its peremptory strikes as a whole was discriminatory. As evidence that the prosecution purposefully discriminated against minority jury pool members, Petitioner notes that the state used six of its thirteen peremptory strikes to excuse African-American pool members. As evidence of the state's alleged discrimination based on sex, Petitioner notes that the state used eight of its thirteen peremptory strikes to exclude males from the jury. This is the only evidence Petitioner has ever offered in support of this claim.

We agree with the district court that it is not debatable that this is not sufficient to make even a *prima facie* case of racial or gender discrimination as to Petitioner's claim that the prosecution used its strikes in a discriminatory manner. Petitioner argues that these numbers present statistical evidence of discrimination. Petitioner, however, has not presented evidence of the racial and gender make-up of the entire jury pool. For the statistical evidence to be relevant, data concerning the entire jury pool is necessary. The number of strikes used to excuse minority and male jury pool members is irrelevant on its own. Indeed, depending on the make-up of the jury pool, such numbers could indicate that the state discriminated against Anglos and females. Moreover, the jury that was seated was diverse both with respect to race and gender. For this reason and those articulated by the district court, no reasonable jurist could disagree with the district court's application of the AEDPA deference to the state court's findings with respect to this part of Petitioner's claim.

As to the individual strikes Petitioner alleges were discriminatory, we hold that no

10

reasonable jurist would disagree with the district court that the state's proffered race-neutral reasons were sufficient. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett*, 514 U.S. at 768 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion)). Petitioner does not point to anything said by the prosecutor in the prosecutor's justification of the challenged strikes that even hints at an inherent discriminatory intent. We need not undertake an in-depth analysis to determine that the district court's deference to the state court findings was not remotely debatable.

Because the claim of discrimination in the prosecution's use of its peremptory strikes overall is without merit, the claim of ineffective assistance of counsel for not raising the issue on appeal is, likewise, without merit. To the extent Petitioner adheres to his pure *Batson* claim, that is, the claim raised on appeal and not allegedly indicating ineffective assistance of counsel, that claim is likewise meritless. Because no reasonable jurists could debate the district court's resolution of this claim, we may not issue a COA as to this issue.

### b. Vienna Convention violation

"The Vienna Convention is a 79-article, multilateral treaty negotiated in 1963 and ratified by the United States in 1969. Mexico is a signatory nation." *United States v. Jimenez-Nava*, 243 F.3d 192, 195 (5th Cir. 2001). Per Article 36, "the treaty requires an arresting government to notify a foreign national of his right to contact his consul." *Id.* at 195 n.2. The state concedes that Petitioner was not notified of his right to contact the Mexican consul.

Petitioner's claim fails for two reasons: 1) it is procedurally defaulted, and 2) even if it were not procedurally defaulted, the Vienna Convention, as interpreted by this Court in the past,

11

does not confer an individually enforceable right.

### 1. Procedural default

The district court held that Petitioner's Vienna Convention claim was procedurally defaulted. Petitioner all but concedes that, under Texas law, he did procedurally default on his Vienna Convention claim by not raising the issue at the trial stage. *See Fisher v. Texas*, 169 F.3d 295, 300-01 (5th Cir. 1999). Petitioner argues, however, that the state's application of the procedural default rule in this case violates the Vienna Convention. To support this conclusion, Petitioner relies on the *LaGrand Case (Germany v. United States of America)*, 2001 ICJ 104 (Judgment of June 27) ("*LaGrand*")). In *LaGrand*, the International Court of Justice held that procedural default rules cannot bar review of a petitioner's claim. *LaGrand* at ¶¶ 90-91. We note that the International Court of Justice adhered to this position again in *Avena and Other Mexican Nationals (Mexico v. United States of America)*, a case brought by Mexico on behalf of Petitioner and others. *See* 2004 ICJ 128 (Judgment of March 31) ("*Avena*") at ¶¶ 110-13, 153.

The Supreme Court, prior to the *Avena* and *LaGrand* decisions, however, ruled that Vienna Convention claims, like Constitutional claims, can be procedurally defaulted, even in a death penalty case. *Breard v. Greene*, 523 U.S. 371, 375 (1998). Though *Avena* and *LaGrand* were decided after *Breard*, and contradict *Breard*, we may not disregard the Supreme Court's clear holding that ordinary procedural default rules can bar Vienna Convention claims. "If a precedent of [the Supreme Court] has direct application in a case [...], the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 484 (1989). That is, only the Supreme Court may overrule a Supreme Court decision. The Supreme

12

Court has not overruled *Breard*. We are bound to follow the precedent until taught otherwise by the Supreme Court.

### 2. No individually enforceable right under Article 36 of the Vienna Convention

Even if Petitioner were not procedurally barred from making his Vienna Convention claim, the case law of our Court precludes success on this claim. In making his Vienna Convention claim, Petitioner necessarily also argues that Article 36 creates an individually enforceable right. For this proposition, Petitioner again relies on *LaGrand*. The International Court of Justice held in *LaGrand* that Article 36 did create personal rights. *LaGrand* at ¶ 77. Again, we note that the International Court of Justice adhered to this position in *Avena*. *See Avena* at ¶ 40.

A prior panel of this Court, however, held that Article 36 of the Vienna Convention does not create an individually enforceable right. *Jimenez-Nava*, 243 F.3d at 198 ("The sum of [petitioner's] arguments fails to lead to an ineluctable conclusion that Article 36 creates judicially enforceable rights of consultation between a detained foreign national and his consular office. Thus, the presumption against such rights ought to be conclusive."). Despite minor differences in this case and that presented in *Jimenez-Nava*, the Court's holding in *Jimenez-Nava* is inescapable. We are bound to apply this holding, the subsequent decision in *LaGrand* notwithstanding, until either the Court sitting *en banc* or the Supreme Court say otherwise. "[N]o panel is empowered to hold that a prior decision applies only on the limited facts set forth in that opinion." *United States v. Smith*, 354 F.3d 390, 399 (5th Cir. 2003). Accordingly, we deny a COA on this issue.

### c. The state's alleged failure to disclose exculpatory information to defense counsel

"*Brady*, we reiterate, held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or

13

to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 124 S. Ct. 1256, 1272 (2004) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). In *Strickler v. Greene*, the Supreme Court framed "the three components or essential elements of a *Brady* prosecutorial misconduct claim: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks*, 124 S. Ct. at 1272 (quoting *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)).

Petitioner's first *Brady* claim is that the government suppressed information about a promise to dismiss a misdemeanor charge against Joe Cantu in exchange for his testimony and the testimony of his wife Christina Cantu against Petitioner. Their testimony helped to establish the precise role Petitioner played in the rapes and murders. The only concrete evidence presented by Medellin to support this claim, however, is an affidavit from Christina Cantu, stating that (1) an employee in the prosecutor's office helped Joe Cantu obtain a lawyer, and (2) the charges against Joe Cantu were later dropped by the state. These two facts, even if true, do not by themselves show that any type of agreement existed. Rather, Petitioner's claim rests upon a substantial degree of speculation. An applicant's speculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim. *Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999).

Petitioner next argues that the government failed to disclose that Joe Cantu was arrested for a misdemeanor. Petitioner's counsel, however, agreed during a pre-trial hearing that the government need only release the felony arrest records of its witnesses. Because Petitioner essentially waived his access to Joe Cantu's misdemeanor arrest record, he may not now claim

14

that such evidence was suppressed by the government.

Even if Petitioner could establish that the government suppressed Joe Cantu's misdemeanor arrest, or that the government suppressed a deal to drop the charges against Joe Cantu, Petitioner nonetheless fails to show that this information is material in light of the overwhelming evidence establishing his guilt. The district court correctly emphasized that "substantial and convincing evidence" of Petitioner's role in the murders existed even without the Cantus' testimony (*i.e.*, Medellin confessed to the rape and murder, he was placed by another witness at the scene of the murder, and he gave the victims' jewelry to his girlfriend).

## IV. CONCLUSION

Petitioner has not shown that reasonable jurists could disagree with the district court's denial of any of his claims. Accordingly, we deny Petitioner's Application for a Certificate of Appealability from Denial of a Petition for Writ of Habeas Corpus.

DENIED.