**Ex parte José Ernesto MEDELLÍN,[1] Applicant.**

**No. WR–50191–03.**

Court of Criminal Appeals of Texas.

July 31, 2008.

1. Applicant filed the pleadings in this case under the name "José Ernesto Medellín Rojas." However, all of the prior papers filed in this Court, the papers filed in the United States Supreme Court, and documents at the Texas Department of Criminal Justice were entered under the name "José Ernesto Medellín." For consistency, we will continue to use the name "José Ernesto Medellín."

Morris Moon, Houston, for Appellant.

Roe Wilson, Assistant District Attorney, Houston, Jeffrey L. Van Horn, State's Attorney, Austin, for State.

### ORDER

PER CURIAM.

We have before us a subsequent application for writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071, § 5, a motion in the alternative for leave to file the application as an original writ of habeas corpus, and a motion for stay of execution.

On September 16, 1994, a jury found applicant guilty of the offense of capital murder. The jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure Article 37.071, and the trial court, accordingly, set applicant's punishment at death. This Court affirmed applicant's conviction and sentence on di-

rect appeal. *Medellin v. State,* No. AP–71,997 (Tex.Crim.App. Mar. 19, 1997) (not designated for publication). Applicant timely filed in the convicting court his initial post-conviction application for writ of habeas corpus in which he raised a claim alleging the violation of his rights under Article 36 of the Vienna Convention. The convicting court recommended that we deny this claim because applicant: (1) had failed to comply with the well-settled Texas contemporaneous-objection rule at trial; and (2) had no individually enforceable right to raise a claim, in a state criminal trial, regarding the Vienna Convention's consular access provisions. We adopted the trial court's findings of fact and conclusions of law and denied habeas relief. *Ex parte Medellin,* No. WR–50,191–01 (Tex Crim.App. Oct. 3, 2001)(not designated for publication). Applicant then filed the same claim in federal district court and was ultimately denied relief. *Medellin v. Cockrell,* Civ. No. H–01–4078, 2003 WL 24309306 (S.D.Tex. April 17, 2003).

On March 31, 2004, the International Court of Justice (ICJ) issued a decision in *Case Concerning Avena and Other Mexican Nationals (Avena),* 2004 I.C.J. No. 128 (March 31, 2004). The ICJ held that (1) the Vienna Convention guaranteed individually enforceable rights; (2) the United States must "provide, by means of its own choosing, review and reconsideration of the convictions and sentences of the [specified] Mexican nationals"; and (3) the United States must determine whether the violations "caused actual prejudice" to those defendants, without allowing American procedural default rules or laws to bar such review. *Id.* at 121–22, 153. In response to the opinion, President Bush issued a memorandum in which he stated that the United States would discharge its obligations under the *Avena* judgment by having State courts give effect to the ICJ decision in accordance with general princi-

ples of comity. Arguing that the ICJ opinion and the presidential memo were new legal and factual bases for his Vienna Convention claim, applicant filed a subsequent application for writ of habeas corpus with the trial court. Reviewing the claim under Article 11.071, § 5, this Court filed and set applicant's case and ordered briefing. *Ex parte Medellin*, 206 S.W.3d 584 (Tex.Crim. App.2005). After briefing, argument, and an exhaustive analysis, this Court determined that neither the *Avena* decision nor the presidential memorandum constituted new legal or factual bases and dismissed the application. *Ex parte Medellin*, 223 S.W.3d 315, 352 (Tex.Crim.App.2006).

On this, his second subsequent application for writ of habeas corpus, and in his motion for a stay of execution, applicant again argues that new developments require us to provide him with judicial review and reconsideration of his Vienna Convention claim under *Avena*.[2] Applicant argues that these new developments consist of: (1) the United States Supreme Court's decision in *Medellin v. Texas*, —— U.S. ——, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008), affirming and clarifying this Court's opinion in applicant's case; (2) the fact that a bill has been introduced in the United States House of Representatives which, if passed into law, would grant applicant a right to the judicial process required by *Avena*; (3) the indication by a Texas Senator that he will introduce similar legislation in the Texas Legislature in the 2009 session; and (4) the fact that the Inter-American Commission on Human Rights, allegedly the "only body to have reviewed *all* of the evidence pertaining to [applicant's] Vienna Convention violation under the standard required by the ICJ," on July 24, 2008, issued its preliminary findings concluding that applicant was prejudiced by the violation of his Vienna Convention rights. Application p. 2.

We have reviewed applicant's second subsequent application and find that it does not meet the dictates of Article 11.071, § 5, and should be dismissed. Art. 11.071, § 5(a). Applicant's motion in the alternative for leave to file the application as an original writ of habeas corpus is denied as is his motion for stay of execution.

IT IS SO ORDERED THIS THE 31ST DAY OF JULY, 2008.

PRICE, J., filed a concurring statement in which COCHRAN and HOLCOMB, JJ., joined, except for Part V; COCHRAN, J., filed a concurring statement in which HOLCOMB, J., joined; MEYERS, J., filed a dissenting statement.

PRICE, J., concurring statement in which HOLCOMB and COCHRAN, JJ., joined except as to Part V.

The applicant alleges three circumstances he contends should qualify him to re-raise his Vienna Convention claim in yet another subsequent post-conviction application for writ of habeas corpus.[1] First, he points to the fact that Mexico has initiated another proceeding in the International Court of Justice (ICJ) seeking clarification of the *Avena* decision,[2] and that the ICJ has requested the United States to take precautionary measures (*i.e.*, refrain from executing him) until it can render a decision. Second, he points to a determination by the Inter-American Commission on Human Rights (IACHR),

---

**2.** Applicant does not phrase his claims specifically in terms of the Vienna Convention. However, the Vienna Convention and the *Avena* judgment are the underlying bases of the claims raised.

**1.** Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820.

**2.** *Case Concerning Avena and Other Mexican Nationals (Mex.v.U.S.)*, 2004 I.C.J. No. 128 (Judgment of Mar. 31).

an international tribunal that is an arm of the Organization of American States, that he was in fact prejudiced by the violation of his Vienna Convention rights.[3] Third, he argues that it would violate due process to execute him now because 1) legislation is pending in Congress that would effectively make the *Avena* judgment binding on domestic courts in the United States, and 2) a state senator has indicated he will introduce a similar bill in the next state legislature. I agree that none of these circumstances justifies this Court in entertaining a subsequent writ application under Article 11.071, Section 5.[4] For the reasons about to be given, I believe this Court's hands are tied. But that does not mean that the Executive Branch cannot act.

## I. International Court of Justice

In his first subsequent writ application, the applicant argued that, under the Supremacy Clause,[5] the *Avena* decision constituted binding federal law that trumped the abuse-of-the-writ provisions of Article 11.071, Section 5. In our opinion in *Ex parte Medellin*, we expressly rejected that argument.[6] Alternatively, the applicant argued that the *Avena* decision constituted new law and/or new facts that would justify a subsequent writ application under Article 11.071, Section 5. We rejected that argument in *Medellin* as well.[7] Having rejected these arguments, we cannot very well hold that a request for precautionary measures pending a new proceeding that has been instituted in the ICJ that would merely clarify the holding of *Avena* either

trumps, or, alternatively, falls under the ambit of, Article 11.071, Section 5. The United States Supreme Court ratified our reliance upon the statutory abuse-of-the-writ doctrine, notwithstanding *Avena*, in its certiori review of our decision.[8] We must therefore heed the current legislative prohibition against entertaining a subsequent writ under these circumstances—unless and until Congress should act in such a way that we should be bound by the *Avena* judgment, notwithstanding contrary state law.

## II. Inter–American Commission on Human Rights

The applicant also alleges that the IACHR's decision that the violation of his Vienna Convention rights was prejudicial and amounted to a violation of the due process guarantees embodied in the 1948 Declaration of the Rights and Duties of Man, constitutes both new law and new facts for purposes of Article 11.071, Section 5. But in *Medellin*, we held that the *Avena* decision constituted law, not fact, and the same must surely be said of any decision of the IACHR.[9] With respect to new law, we held in *Medellin* that, to be cognizable under Article 11.071, Section 5, it must emanate from "a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state."[10] International tribunals are not included within this statutory ambit. In any event, it is not clear—and it has not been pled here—that a decision of the IACHR is

3. *Medellin v. United States*, Case 12.644, Inter–Am. C.H.R., Report No. 45/08 OEA/Ser/L/V/II.132, doc. 21 (2008).

4. Tex Code Crim. Proc. art. 11.071, § 5.

5. U.S. Const. art. II, § 2, cl. 2.

6. 223 S.W.3d 315, 330–32 (Tex.Crim.App. 2006).

7. *Id.* at 348–352.

8. *Medellin v. Texas*, —— U.S. ——, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008).

9. *Ex parte Medellin, supra*, at 351.

10. *Id.* at 352.

binding on domestic courts in the same way that it has been arguable that a decision of the ICJ with respect to the Vienna Convention is binding under the Supremacy Clause by virtue of the Optional Protocol.[11] Thus, even if the IACHR judgment somehow constituted a new fact or law for purposes of Article 11.071, Section 5, notwithstanding what we said in *Medellin*, it is still not clear that by invoking it the applicant has presented anything that, even if true, would entitle him to relief.

## III. Pending Legislation

The applicant alleges that on July 14, 2008, a bill was introduced in the House of Representatives, entitled the "Avena Case Implementation Act of 2008," which would expressly provide for judicial remedies to carry out the treaty obligations that *Avena* construed the Vienna Convention to impose.[12] The applicant contends that to execute him while such legislation is pending would violate federal due process, given the fact that nobody disputes that the *Avena* decision, once implemented by Congress, would require domestic courts to undergo a review and reconsideration of his conviction and sentence before he could be executed.[13] This is entirely too speculative to support a due process claim. The applicant has no expectation that the proposed legislation will be enacted. Until such a statute is passed, the *Avena* decision is not binding; and if *Avena* is not binding, the applicant cannot predicate a due process claim upon it. Again, the applicant simply fails to state facts that

**11.** Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention on Consular Relations, Apr. 21, 1963, 21 U.S.T. 325, T.I.A.S. No. 6820. "By ratifying the Optional Protocol to the Vienna Convention, the United States consented to the specific jurisdiction of the ICJ with respect to claims arising out of the Vienna Convention." *Medellin v. Texas, supra*, 128 S.Ct. at 1354.

**12.** As introduced in the House of Representatives, and referred to the Judiciary Committee, the bill reads:

SECTION 1. SHORT TITLE.
*This Act may be cited as the "Avena Case Implementation Act of 2008".*
SECTION 2. JUDICIAL REMEDY.
(a) CIVIL ACTION.—Any person whose rights are infringed by a violation by any nonforeign governmental authority of Article 39 of the Vienna Convention on Consular Relations may in a civil action obtain appropriate relief.
(b) NATURE OF RELIEF.—Appropriate relief for the purposes of this section means—
(1) any declaratory or equitable relief necessary to secure the rights; and
(2) in any case where the plaintiff is convicted of a criminal offense where the violation occurs during and in relation to the investigation or prosecution of the offense, any relief required to remedy the harm done by the violation, including the vitiation of the conviction or sentence where appropriate.
(c) APPLICATION.—This Act applies with respect to violations occurring before, on, or after the date of the enactment of this Act.

**13.** In *Medellin v. Texas, supra*, 128 S.Ct. at 1356, the Supreme Court observed, "No one disputes that the *Avena* decision—a decision that flows from the treaties through which the United States submitted to ICJ jurisdiction with respect to Vienna Convention disputes—constitutes an *international* law obligation on the part of the United States." But the Supreme Court held that implementing legislation was required before the particular international law obligation embodied in Article 36 of the Vienna Convention as construed by the ICJ in *Avena* would have binding domestic legal effect. *See, e.g., id.* at 1357, 1367 ("Because none of these treaty sources creates binding federal law in the absence of implementing legislation, and because it is uncontested that no such legislation exists, we conclude that the *Avena* judgment is not binding domestic law. * * * In sum, while the ICJ's judgment in *Avena* creates an international law obligation on the part of the United States, it does not of its own force constitute binding federal law that pre-empts state restrictions on the filing of successive habeas petitions.").

would entitle him to habeas corpus relief. Any claim based upon legislation that might be introduced at the next legislative session in Texas suffers a similar fate.

## IV. Original Application for Writ of Habeas Corpus

The applicant urges us to by-pass the abuse-of-the-writ provisions of Article 11.071, Section 5, by simply treating his application as an invocation of our original writ jurisdiction. This we may not do. It is indisputable that the applicant is challenging the validity of his conviction and death sentence. We have made it clear that under such circumstances we are bound to entertain any post-conviction writ of habeas corpus only under the purview of the procedures set out in Article 11.071— including the abuse-of-the-writ provisions in Article 11.071, Section 5.[14]

## V. Executive Clemency

For all of the above reasons, this Court is not at liberty to stop the applicant's execution. But the Governor is. The applicant informs us that he has requested that the Board of Pardons and Paroles recommend to the Governor that he grant the applicant a 240–day reprieve so that there will be time for the proposed federal legislation to be considered in Congress.[15] Moreover, the Governor himself may grant a 30–day reprieve even absent a recommendation from the Board.[16] It would be an embarrassment and a shame to the people of Texas and the rest of the country (albeit not presently unconstitutional) if we were to execute the applicant despite our failure to honor the international obligation embodied in the *Avena* judgment when legislation may well be passed in the near future by which that obligation would become, not merely precatory, but legally (and retroactively) binding upon us. The Executive Branch most appropriately exercises its clemency authority when the judicial branch finds itself powerless to rectify an obvious and manifest injustice. This, I think, is such a situation, and I would urge the Board and the Governor to act.

COCHRAN, J., concurring statement, HOLCOMB, J., joins.

I join the Court's Order denying applicant's motion for leave to file an original application and motion for a stay of execution and dismissing his third application for a writ of habeas corpus. Even if our law allowed for consideration of this third (and repetitious) application, which it does not, applicant is not entitled to any relief on the merits of his claim under Texas or United States law.

First, let us be clear about applicant's claim. Born in Mexico, applicant was brought to the United States when he was three years old and, at the time he was arrested, had lived in this country for fifteen of his eighteen years. He spoke fluent English, but he never obtained, nor apparently ever sought, U.S. citizenship. So, at the time of his arrest and trial, he was legally a Mexican citizen. His claim is that no one informed him of his right to contact the Mexican consulate. This is true. It is also true that he was never denied access to the Mexican consulate. The problem is that he apparently never

---

**14.** *Ex parte Smith,* 977 S.W.2d 610, 611 (Tex. Crim.App.1998), *citing Ex parte Davis,* 947 S.W.2d 216, 221, 223 (Tex.Crim.App.1996) (Opinion of McCormick, P.J.) ("the Legislature clearly has intended for Article 11.071 to provide the exclusive means by which this Court may exercise its original habeas corpus jurisdiction in death penalty cases.").

**15.** Tex. Const. art. IV, § 11(b); 37 TAC §§ 143.41(b) & (c); §§ 143.43(f)(1) & (j)(1).

**16.** Tex. Const. art. IV, § 11(b); 37 TAC § 143.41(a).

told any law enforcement or judicial official that he was a Mexican citizen until some four years after his conviction. Applicant never informed the arresting officers that he was a Mexican citizen.[1] He makes no claim that he informed any magistrate that he was a Mexican citizen. He points to no evidence that he informed the trial judge before or during his trial that he was a Mexican citizen.[2] We do not know what the arresting officers, the magistrate, or the trial judge would have done had any of them been informed that applicant was a citizen of Mexico. Perhaps they would have informed him of his right to contact his consulate for assistance. While Texas authorities clearly failed in their duty to inform this foreign national of his rights under the Vienna Convention, this foreign national equally failed in his duty to inform those authorities that he was a Mexican citizen. Although one would like to think that all Texas public officials are clairvoyant about the nationality of all who appear before them, they are not required to be, nor, when there is no reason to believe that a defendant is anything but a U.S. citizen, should they be.

As this Court explained at considerable length in applicant's last application for a writ of habeas corpus,[3] Texas law does not permit a defendant to raise a claim four years after his trial that he was not noti-fied before or during his trial of his rights under the Vienna Convention, the U.S. Constitution, the Texas Constitution, or any other law. This claim was procedurally defaulted by the failure to raise it in a timely manner.

In Texas, we have a contemporaneous objection rule which requires all litigants to make a timely request, claim, or objection or forfeit the right to raise that request, claim, or objection after trial. This same rule applies in every jurisdiction in America. As the Supreme Court explained over thirty years ago, the contemporaneous objection rule serves important judicial interests in American criminal cases and deserves respect throughout the land.

A contemporaneous objection enables the record to be made with respect to the constitutional claim when the recollections of witnesses are freshest, not years later in a federal habeas proceeding. It enables the judge who observed the demeanor of those witnesses to make the factual determinations necessary for properly deciding the federal constitutional question.[4]

Furthermore, a contemporaneous objection permits the trial judge to remedy potential error before it occurs.[5] In the present case, for example, had applicant

---

**1.** In his confession to the police, he did tell the interviewing officer that "I was born in Laredo Mexico on 3/4/75. I last went to school at Eisenhower High School and have a total of 8 years of formal education." He did nothing to inform the officer that, despite his almost life-long residence in the U.S., he was not a U.S. citizen. He did tell the Harris County Pre–Trial Services Agency that he was not a U.S. citizen, but that public service agency has no law enforcement or judicial role. It merely collects information for assessing whether to recommend release on a pre-trial recognizance bond.

**2.** Applicant, like three of his fellow gang-member co-defendants and applicant's youn-

ger brother, the one juvenile co-defendant, has a Hispanic surname. In the melting pot that is America, many U.S. citizens have ethnic names, but are native born or naturalized. Our laws do not assume that those who were born in a foreign country or who have ethnic surnames are not fellow citizens.

**3.** *Ex parte Medellin,* 223 S.W.3d 315 (Tex. Crim.App.2006), *aff'd,* —— U.S. ——, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008).

**4.** *Wainwright v. Sykes,* 433 U.S. 72, 88, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

**5.** *Id.*

informed any legal officer that he was a Mexican national and wanted to consult with his consulate, any such official could have (and presumably would have) willingly complied with the requirements of the Vienna Convention. If applicant had delayed telling anyone of his Mexican citizenship until trial, the trial judge could have immediately informed the Mexican consulate, allowed applicant to do so himself, or perhaps given him a continuance to seek assistance from his consulate.

As the Supreme Court has explained, the failure to abide by the contemporaneous objection rule "may encourage 'sandbagging' on the part of defense lawyers, who may take their chances on a verdict of not guilty in a state trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off." [6] Finally, it is the criminal trial itself that is "the main event"; it is not "a tryout on the road" to more than a decade of appellate review and re-review.[7]

> The failure of the federal habeas courts generally to require compliance with a contemporaneous-objection rule tends to detract from the perception of the trial of a criminal case in state court as a decisive and portentous event. A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the court-room, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification.[8]

Texas courts have long followed the Supreme Court's reasoning concerning the importance of the contemporaneous objection rule in the fair, effective, and efficient operation of its state courts.[9] Indeed, the

6. *Id.* at 89, 97 S.Ct. 2497.

7. *Id.* at 90, 97 S.Ct. 2497.

8. *Id.*

9. *See, e.g., Saldano v. State,* 70 S.W.3d 873, 886–88 (Tex.Crim.App.2002) ("Our rules require defendants to object at trial in order to preserve an error for review on appeal.... Our law has always been thus. The courts of every state and the courts of the United States have similar rules.") (footnotes omitted). In *Saldano,* we noted that "objections promote the prevention and correction of errors. When valid objections are timely made and sustained, the parties may have a lawful trial. They, and the judicial system, are not burdened by appeal and retrial. When a party is excused from the requirement of objecting, the results are the opposite." *Id.* at 887. Of course, not *all* rights are necessarily waived by the failure to assert them in a timely manner. As we stated in *Saldano,* "[a]ll but the most fundamental rights are thought to be forfeited if not insisted upon by the party to whom they belong. Many constitutional rights fall into this category. When we say 'that even constitutional guarantees can be waived by failure to object properly at trial,' we mean that some, not all, constitutional rights may be forfeited." *Id.* (some internal quotations omitted). Thus, violations of " 'rights which are waivable only' and denials of 'absolute systemic requirements' " may be raised for the first time on appeal.

The failure to notify a foreign national defendant of his right to contact his consulate is not such a "waivable only" right nor is it one that is an absolute systemic requirement without which a trial is necessarily fundamentally unfair. In fact, the United States Supreme Court has expressly held that Vienna Conven-

contemporaneous objection rule has been a bulwark of the Anglo–American Common Law for centuries. It is based upon our fundamental concept of an adversarial system of justice. The International Court of Justice, however, is more familiar with the Napoleonic Code and an inquisitorial system of criminal justice. That system is very different from our own, and has its own virtues and vices. It does not rely upon our adversarial principles in which a jury listens to opposing lawyers presenting all of the relevant, conflicting, and competing evidence and witnesses to the factfinder at one time and in one place with the judge ruling on all legal questions and claims at that time. In our Anglo–American system the trial is the main event. The European criminal justice system does not depend upon our finely-tuned jury trial procedures, and thus it need not be concerned about the importance of our contemporaneous objection rule or that of procedural default. But those rules are essential to our American justice system.

Applicant claims that the *Avena* judgment necessarily trumps all Texas and federal procedural rules because it ordered that the convictions of fifty-four foreign nationals be "reviewed" regardless of bedrock American procedural default rules. The Supreme Court held otherwise in its recent decision in *Medellin v. Texas.*[10] Although we accord the greatest respect to, and admiration for, the International Court of Justice (ICJ) and its judgments, we, like the Supreme Court, cannot trample on our own fundamental laws in deference to its judgment. We would give even the Devil the benefit of our American law, but if we cut down our laws to suit another sovereign that operates under a different system of justice, we could not stand upright in the lawless winds that would then blow.[11] If we violate our state and federal procedural rules for this particular applicant, we should violate them for all American defendants as well. And then we would have no rules and no law at all.

But it seems that the ICJ intended to do just that: to impose its sense of Napoleonic Code inquisitorial justice without regard for other sovereigns' well-established laws and procedures. So let me consider this case from its perspective and review the merits of applicant's claim in accord with the ICJ's *Avena* judgment.[12]

---

tion claims are subject to normal American rules of procedural default if a defendant fails to make a contemporaneous objection. *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 360, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006) ("We therefore conclude, as we did in *Breard*, that claims under Article 36 of the Vienna Convention may be subjected to the same procedural default rules that apply generally to other federal-law claims."); *Breard v. Greene*, 523 U.S. 371, 375–76, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (*per curiam* ).

10. —— U.S. ——, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008).

11. *See* Robert Bolt, A Man for All Seasons (1960):

William Roper: So, now you give the Devil benefit of law!
Sir Thomas More: Yes! What would you do? Cut a great road through the law to get after the Devil?

William Roper: Yes, I'd cut down every law in England to do that!
Sir Thomas More: Oh? And when the last law was down, and the Devil turned 'round on you, where would you hide, Roper, the laws all being flat? This country is planted thick with laws, from coast to coast, Man's laws, not God's! And if you cut them down, and you're just the man to do it, do you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake!

12. Justice Stevens, in his concurring opinion in *Medellin*, not-so-subtly suggested that, even though he and six other members of the Supreme Court affirmed the legal position of this Court concerning the procedural default rule, we really should review the merits of applicant's claim because "[t]he cost to Texas of complying with *Avena* would be minimal, particularly given the remote likelihood that

Applicant was arrested for, charged with, and convicted of an extraordinarily gruesome rape and murder of two teen-aged girls in Houston, Texas, in 1993. The two girls, 14–year–old Jennifer Lee Ertman and 16–year–old Elizabeth Pena, were friends and classmates at Waltrip High School. They were simply walking home one June evening when they were attacked by applicant and several of his gang-members who repeatedly raped both girls, then dragged them into the woods to kill them and hide their bodies. Applicant helped to strangle at least one of the girls with her own shoelace. He later complained to a friend that he had a hard time getting Jennifer Ertman to die and had to step on her throat to finish her off. The girls' decomposed bodies were discovered four days later.

Applicant bragged to his buddies that both of the girls were virgins until he and his cohorts raped them. He confessed to police officers after being properly advised of his rights to counsel under *Miranda.*[13] He explained, in great detail, how his group was involved in a gang-initiation rite until the two girls innocently wandered past them on their way home. His written confession displayed a callous, cruel, and cavalier attitude toward the two girls that

he had raped and helped to murder. Surely no juror or judge will ever forget his words or his sordid deeds.

Applicant and four of his fellow gang members were convicted of these murders and all were sentenced to death.[14] One of them, Sean Derrick O'Brien, has been executed. The death sentences for two of the gang members were later commuted to life in prison under *Roper v. Simmons,* because they were seventeen at the time of the murders.[15] Applicant and Peter Cantu both remain in prison awaiting execution.

Applicant's argument on the merits of his consular notification claim is as follows:

- If I had been told before trial that I could notify the Mexican consulate that I had been arrested for a double murder and rape, I would have done so;

- If I had notified the Mexican consulate before trial that I wanted its help, it would have given me "substantial assistance";

- The "substantial assistance" that the Mexican consulate would have given me would be that of providing me with a top-notch lawyer instead of the lawyer that the trial court appointed to represent me;

the violation of the Vienna Convention actually prejudiced José Ernesto Medellin." 128 S.Ct. at 1375 (Stevens, J., concurring). I agree with Justice Stevens that it is extremely remote that applicant was prejudiced in any way by the failure of Texas officials to inform him that he could seek assistance from his consulate.

13. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). One can only wonder if the criminal justice systems with which the distinguished judges on the ICJ are familiar require that law enforcement officers give all arrested suspects explicit warnings concerning their right to silence, their right to an attorney before talking to the police, the right to have an attorney appointed for them if they cannot afford them, notification that

any statements that they make can be used against them in a court of law, and, under Texas law, the right to terminate an interview with the police at any time. Telling an arrested foreign national that he has a right to contact his consulate is an important international right, but surely it is not nearly as important as giving him *Miranda*-type warnings.

14. A sixth member of the gang was also prosecuted, but was not sentenced to death because, under Texas law, he was a juvenile at the time of the offense and thus ineligible for the death penalty.

15. *See Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

- The lawyer that did represent me at trial had been suspended from the practice of law for ethics violations in a different case;

- If a different, better lawyer, paid by the Mexican Consulate, had represented me at trial, I would not have been sentenced to death for the rape-murder of these two girls, even though my four cohorts were all sentenced to death in their trials, represented by their lawyers.

Applicant argues that a lawyer chosen by the Mexican consulate would have introduced sufficient background, character, and "life history" evidence that the jury would necessarily have sentenced him to life in prison instead of death. He argues that a better pretrial investigation by a better lawyer would have shown that applicant grew up in an environment of abject poverty and violence. He states that he was abandoned by his parents at the age of four and left to live with an elderly relative. He also states that he became "exposed to serious violence shortly after rejoining his parents in Houston five years later." Then, simultaneously abandoned and abused by his parents, he was further exposed to "bad influences" in middle school. He claims that, "[a]s recent immigrants, his parents lacked the skills to understand and address the pressures [applicant] faced at school." So he developed behavioral and emotional problems as well as an alcohol abuse problem, and he dropped out of school. And those "profound experiences" explain why he and his five fellow gang-members raped, robbed, and killed two teen-aged girls who just happened to walk by during their gang initiation. Applicant asserts, "On the record before this Court, the result is not fairly in doubt: were it not for the violation of the Vienna Convention, [applicant] would not be on death row."

This argument might have some plausible intellectual appeal had just one, any one, of applicant's cohorts not been sentenced to death despite the best efforts of their respective attorneys during their individual trials. Applicant may or may not have been the ringleader of this gang, but he was, at a minimum, fully and gleefully involved in the brutal rapes and murders of these two young girls.[16] The evidence at trial showed that he bragged about his gory and sadistic exploits to his friends. The State also put on considerable evidence showing his prior violence and post-offense violence in jail. The jurors heard a great deal of evidence about applicant's extensive gang-related illegal activities before this crime and how he was expelled from school because of gang activities. No Officer Krupke would ever conclude that applicant's crimes and those of his cohorts were just the unfortunate product of a sad and sorry upbringing.[17]

Applicant complains that his trial attorney was incompetent. These claims have been reviewed by the trial court, by this Court, by a federal district court, and by the Fifth Circuit Court of Appeals.[18] All

---

**16.** In addressing applicant's legal claims, it is not necessary to recite all of the specific details of this disgusting sexual attack and tortuous murders. Suffice it to say that the jury heard overwhelming evidence of applicant's depravity and of the girls' suffering.

**17.** See Stephen Sondheim, "Gee Officer Krupke," West Side Story:

Dear kindly Sergeant Krupke,
You gotta understand,
It's just our bringin' up-ke

That gets us out of hand.
Our mothers all are junkies,
Our fathers all are drunks.
Golly Moses, natcherly we're punks!
Gee, Officer Krupke, we're very upset;
We never had the love that ev'ry child oughta get.
We ain't no delinquents,
We're misunderstood.
Deep down inside us there is good!

**18.** In its published opinion, Medellin v. Dretke, 371 F.3d 270 (5th Cir.2004), the Fifth

of these courts (a total of fourteen individual judges) have rejected those complaints as being totally without merit. This claim could have been, but was not, submitted to the U.S. Supreme Court. Further review by any lower court would be redundant. It is highly improbable that any lawyer in the State of Texas, the United States, the European Union, or any other jurisdiction could have saved applicant (or any of his cohorts) from a sentence of death for the heinous, horrific and mindless offenses that they committed during one summer evening in 1993 in the State of Texas.

In sum, I wholeheartedly agree with Justice Stevens's conclusion that "[t]he cost to Texas of complying with *Avena* would be minimal, particularly given the remote likelihood that the violation of the Vienna Convention actually prejudiced José Ernesto Medellin." [19] I would go further: there is no likelihood at all that the unknowing and inadvertent violation of the Vienna Convention actually prejudiced Medellin. This was a truly despicable crime committed by five truly brutal young men who were deadly dangerous to anyone who might find themselves near them. All five were sentenced to death by separate juries after hearing all of the evidence in each of their individual trials. No matter how long the courts of this state, this nation, or any other nation review, re-review, and re-review once again the disgusting facts of this crime and these perpetrators, the result should be the same: These juries reached a reasonable verdict, beyond a reasonable doubt, that a sentence of death was the only appropriate punishment under Texas law.

Some societies may judge our death penalty barbaric. Most Texans, however, consider death a just penalty in certain rare circumstances. Many Europeans may disagree. So be it. But until and unless the citizens of this state or the courts of this nation decide that capital punishment should no longer be allowed under any circumstances at all, the jury's verdict in this particular case should be honored and upheld because applicant received a fundamentally fair trial under American law.

MEYERS, J., dissenting statement.

I would file and set applicant's Article 11.071/original writ. *See Ex parte Davis,* 947 S.W.2d 216 (Tex.Crim.App.1996).

Circuit sets out the history of these ineffective assistance of counsel claims. One of those claims was that counsel failed to offer evidence that applicant had successfully completed a prior juvenile probation and this evidence would have shown that he was not a future danger. The Fifth Circuit noted that this failure was hardly important in comparison to the brutal murders he committed thereafter or the fact that on "two separate occasions while [applicant] was in the Harris County jail awaiting trial, [he] was found to have hidden shanks in his cell. One cannot reasonably fathom how the fact that [applicant] once complied with probation as a juvenile rebuts the overwhelming evidence that [he] posed a future danger. Nothing that his probation officer may have said could have conceivably caused the jury to decide the question of [applicant's] future dangerousness in [his] favor." *Id.* at 276.

19. *Medellin v. Texas,* —— U.S. ——, 128 S.Ct. 1346, 1375, 170 L.Ed.2d 190 (2008) (Stevens, J., concurring).