IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,669






EX PARTE ROSA ESTELA OLVERA JIMENEZ, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


CAUSE NO. D-1-DC-04-904165 IN THE 299TH DISTRICT COURT


TRAVIS COUNTY






 Cochran, J., delivered the opinion of the Court in which Keller, P.J., and
Price, Womack, Johnson, Keasler, Hervey, and Alcala, JJ., joined. Meyers,
J., did not participate.



 This is a tragic case involving the death of a toddler who choked on a wad of paper
towels while applicant was babysitting him. The question at trial was whether the child
stuffed the towels down his own throat and died accidentally or whether applicant forced the
towels into his mouth and caused his death.

 A jury convicted applicant of felony murder and injury to a child and sentenced her
to 75 years in prison for the murder and 99 years in prison for the injury to a child. The court
of appeals affirmed applicant's convictions, (1) and we denied applicant's petition for
discretionary review. Applicant then filed an application for a writ of habeas corpus and,
after conducting extensive hearings, the habeas judge recommended that we grant applicant
a new trial. (2) The habeas judge concluded that (1) applicant's due process rights under Ake
v. Oklahoma (3) were violated because she was denied adequate funding to hire experts, and
(2) trial counsel was ineffective because he failed to (a) retain qualified experts, (b) make a
written request for such experts, and (c) object and request a mistrial and a continuance in
response to his own expert's testimony. Although we agree with some of the habeas judge's
factual findings, we do not adopt them all because some of them are not supported by both
the trial and habeas records. As the ultimate fact finder, we will "exercise our authority to
make contrary or alternative findings and conclusions" when necessary. (4) After reviewing
all of the evidence, we find that applicant has failed to show that she is entitled to a new trial. 
Therefore, we deny relief.

I.


A. Background.

 According to applicant, she was babysitting 21-month-old B.G. when she saw him
walking toward her and noticed that he was "limp and purple." After a neighbor called 911,
paramedics arrived and extracted a "large mass" of "blood soaked" paper towels stuffed into
B.G.'s throat. B.G. died three months later from brain damage due to the prolonged lack of
oxygen during the choking. The court of appeals's opinion described the trial testimony in 
detail and summarized the theories of both the defense and the State:

 Jimenez's theory was that the entire incident was an accident. B.G. liked to
play with paper towels and put things in his mouth. On the day in question, he
put the paper towels in his mouth and accidentally swallowed them. Jimenez
discovered B.G. choking, tried to help him in the bathroom (thus explaining
the blood found there), and when she was unable to do so, immediately carried
him to her neighbor's apartment. Jimenez found support in the fact that
witnesses who had tried to look inside B.G.'s mouth had been unable to do so
because B.G. kept biting their fingers. That would have been impossible,
according to Jimenez, if B.G.'s airway had been occluded for a long period of
time. The defense also portrayed Jimenez as a young pregnant woman who
would not have been physically able to commit the crime of which she was
accused. Additionally, the defense claimed that Jimenez's various
explanations of the incident were largely consistent, and that any minor
inconsistencies were the result of the trauma that she had just experienced and
the fact that she did not have a proper understanding of the English language. 
Her possibly incriminating statements to Officer De Los Santos were also
attributed to trauma and De Los Santos's aggressive questioning. Jimenez
also argued that the State's medical experts were biased in the State's favor
because of the emotional nature of the case. Finally, Jimenez argued that her
expert, Dr. Kanfer, provided testimony that the blood on the paper towels was
primarily the result of pulmonary edema and that if the paper towels had been
forced down B.G.'s throat, there should have been evidence of injury to the
child's face or mouth and evidence that the paper towels had been shredded by
the child's teeth.


 The State's theory was that Jimenez had forced the wad of paper towels
down B.G.'s throat. The blood found on the paper towels and in Jimenez's
bathroom, in the State's view, was evidence of force, not an accidental
choking. The State's medical experts had testified that it was physically
impossible for a 21-month-old child to place five paper towels down his
throat, and that the child's gag reflex would prevent the child from accidentally
swallowing such a large object. Furthermore, the State argued that Jimenez
provided inconsistent explanations of how she found the child and that her
statements to Officer De Los Santos were incriminating. Additionally, the
State referred to photographic evidence of what appeared to be bite marks on
Jimenez's hand and Jimenez's admission to Officer De Los Santos that B.G.
bit her. Based on this evidence, the State argued, "Folks, we don't need a
forensic odontologist to tell you what this is on her hand." (5)


 The resolution of this case depended primarily on expert testimony (6) concerning
whether B.G. could have stuffed the five wadded-up, double-ply paper towels into his mouth
by himself and accidentally choked on them or whether that was "physically impossible," in
which case applicant must have forced the wad down his throat. 

B. The Trial Testimony Concerning "Accident" or "Homicide." 

 At trial, Dr. John Boulet testified that he was a board-certified pediatric emergency
physician who first treated B.G. at the hospital. He stated that he saw the wad of paper
towels that had been removed from B.G.'s throat, and that it was nearly the size of his own
fist. (7) In his opinion, an object of that size could not go down a child's airway accidentally;
"it would have to be put down there." 

 Dr. Patricia Oehring testified that she is a pediatric critical-care physician. She was
B.G.'s primary doctor once he was moved from the emergency room to the intensive care
unit. When shown a photograph of the wad of paper towels, she said that it was not possible
for B.G. to put this wad down his throat all by himself. Although toddlers "definitely" put
things that look like candy or food into their mouths, "[i]f it doesn't taste good or have an
interesting texture, they're not going to leave it in their mouths. They're not going to shove
it to the back of their mouth." She stated that slippery items-like buttons or coins-might
slide down their throats, but that "children don't suck on paper towels." 

 She concluded that B.G.'s gag reflex would have prevented him from forcing a large
object down his throat: "[H]e'll gag as soon as you hit the soft palate" and the gag reflex
operates all the way down the airway. In her opinion, an adult forced the paper towels into
B.G.'s throat: "He'd have to be held down. . . . [H]e would have been coughing and gagging
and bleeding and fighting and struggling up to the point where his brain didn't get enough
oxygen to where he became limp." (8) 

 Finally, Dr. Oehring said that a child of B.G.'s age would not have the strength or
dexterity to "wad" the paper towels together into a small ball. She thought that the wad must
have been soaked in "water or something" before being put into his mouth. (9)

 Dr. Elizabeth Peacock, a forensic pathologist and deputy medical examiner, (10) testified
that B.G.'s death was a homicide caused by damage to the brain from a lack of oxygen. This
finding was "not a close call" because "the physics of it [being an accidental death] are
impossible." She explained that the back of the throat of a 21-month-old child is small, less
than an inch in diameter. "The only things that can really get down there and obstruct, in my
opinion, and in the . . . forensic texts are something that's round or small to that degree."

 The defense expert, Dr. Ira Kanfer, is a forensic pathologist and medical examiner. 
In his opinion, B.G.'s choking was accidental. He believed that B.G. would have been able
to wad up the paper towels himself, stuff them into his mouth, and accidentally swallow
them. He explained that he had conducted an experiment to test this theory by wadding up
five paper towels, soaking them in water, and compressing them into a ball small enough to
fit into a toddler's mouth and throat. 

 Dr. Kanfer explained that, if someone had forced five paper towels down B.G.'s
throat, there should have been some evidence of trauma "around the cheeks, the lips, the
teeth, [or] a cut gum" because "[t]he child's going to fight like hell. There's going to be
bruises. There's going to be tears." (11) Furthermore, B.G.'s teeth would have ripped the paper
towels to shreds as someone tried to force them past his teeth. Dr. Kanfer said that the
absence of any evidence of bruising and shredded towels was "crucial" to the investigation
and expert conclusions.

 Dr. Kanfer also thought that the blood found on the towels was consistent with
pulmonary edema, a reaction that can occur when a person is choking, where blood flows
into the air sacs in the lungs. He stated that the results of B.G.'s chest x-ray taken several
days after the incident were consistent with pulmonary edema. (12) 

 Dr. Kanfer also disagreed with the State's theory that B.G. had stopped breathing by
the time of the 911 call. In his opinion, B.G. was experiencing "agonal" breathing, a result
of severe oxygen deprivation. He said that when a person's airway is completely blocked,
the heart cannot continue to beat for more than four to five minutes and that, after the heart
stops, all "purposeful movement" lasts only a minute or two longer. Thus, B.G. would not
have been able to bite the neighbor's or the paramedic's fingers when they tried to open his
mouth if the choking occurred earlier than the time applicant said. (13) 

 Finally, Dr. Kanfer suggested that the various attempts to resuscitate B.G. by
applicant, the neighbor, and the paramedic may have driven the wad farther down his throat
and accidentally made the obstruction worse. 

 The defense also called Dr. Randall Alexander, a board-certified pediatrician, as a
hostile witness. Dr. Alexander agreed with Dr. Kanfer that, if a child's airway is completely
occluded, his heart would not continue to beat for an hour, and that pulmonary edema might
(or might not) occur when one's airway is blocked. However, on cross-examination, Dr.
Alexander largely agreed with the testimony of the treating doctors. (14)

 The jury was presented with two possible, but conflicting, theories concerning B.G.'s
death. There was medical evidence to support either possibility: intentional homicide or self-inflicted accidental death. The jury found applicant guilty, rejecting the defense theory of
an accidental death. The court of appeals reviewed all of the evidence on appeal and held
that, viewing that evidence in the light most favorable to the verdict, "a rational jury could
have found that [applicant] forced the wad of paper towels down B.G.'s throat." (15) 

C. The Testimony at the Habeas Hearing Concerning "Accident" or "Homicide."

 After the court of appeals affirmed her conviction, applicant filed an application for
a writ of habeas corpus, claiming, among other things, "actual innocence" based on
additional expert evidence that B.G. could have, and most likely did, put the wad of paper
towels into his mouth and then accidentally choke on them. During the habeas proceedings,
applicant presented the live testimony of two pediatric specialists from the Children's
Hospital of Philadelphia, Dr. Karen Zur, a pediatric otolaryngologist, and Dr. John
McCloskey, a pediatric anesthesiologist and critical-care specialist. She also submitted an
affidavit from Dr. Janice Ophoven, a pediatric forensic pathologist. These were all highly
qualified experts who based their opinions upon a scientific methodology, and their opinions
were supported by scientific data as well as familiarity with the facts of this case.

 They, like Dr. Kanfer, questioned the reliability of the conclusions offered by the two
doctors who had cared for B.G., Dr. Alexander (whom applicant had called as a hostile
witness) and the two medical examiners who had testified at trial. These new experts, like
Dr. Kanfer, testified that B.G.'s injury was likely due to an accidental choking. Their
credentials were even more impressive than those of Dr. Kanfer and their examples even
more vivid and detailed than his. They, like Dr. Kanfer, presented an eminently plausible
theory of how B.G. could have accidentally choked on a wet wad of paper towels.

 The habeas judge made detailed factual findings concerning these three experts, their
credentials, their opinions, and the factual bases for their opinions. (16) He found the three new
defense experts credible and reliable, and he determined that the State's experts did not rebut
their conclusions. But he also concluded that their opinions were not "newly discovered" or
sufficient to show that applicant was "actually innocent." (17) Furthermore, neither the habeas
judge nor applicant pointed to any significantly "new" (18) or materially "different" expert
opinions than those expressed by Dr. Kanfer at trial, although the new experts may have been
even more highly qualified than Dr. Kanfer to express opinions on some specific aspects of
this case. (19) Some of the original witnesses from the trial also testified during the habeas
hearing, including the EMT who removed the wad of towels from B.G.'s throat, Dr. Oehring
(now known as Dr. Aldridge), the treating pediatric critical-care doctor, and Dr. Peacock, the
forensic pathologist. Dr. Alexander-the consulting pediatrician-submitted an affidavit. 
They all reaffirmed their trial testimony. The State also called Dr. James Eskew, an
otolaryngologist like Dr. Zur, who stated that he did not believe that B.G. accidentally
choked on the wad of paper towels. He, like Drs. Boulet, Oehring, Peacock, Parangao, and
Alexander, did not believe it likely that a child could wad up paper towels of this size and
put that wad down his throat.

 Although the habeas judge concluded that the State's witnesses at the habeas hearing,
did not "credibly rebut[] the testimony of applicant's experts that B.G. likely choked
accidentally on the wad of paper towels," he acknowledged, in his legal conclusions, that the
credibility of dueling experts is for the jury to decide. Thus applicant failed to show, by clear
and convincing evidence, that she was actually innocent of murder or injury to a child. As
the United States Supreme Court recently noted, in the context of upholding the sufficiency
of the evidence in a "shaken baby" homicide case, "Because rational people can sometimes
disagree, the inevitable consequence of this settled law is that judges will sometimes
encounter convictions that they believe to be mistaken, but that they must nonetheless
uphold." (20) We, like the court of appeals and the habeas judge, are legally constrained to
uphold the jury's verdict in this case. We therefore adopt the habeas judge's
recommendation and deny relief on applicant's "actual innocence" claim.

 We requested additional briefing on two of applicant's claims, one based on Ake v.
Oklahoma, the other on ineffective assistance of counsel. We turn now to those claims. 

II.


 Applicant contends that she was denied due process and the effective assistance of
counsel because the trial judge denied her the necessary funds for expert assistance as
guaranteed under Ake v. Oklahoma. (21) In this case, applicant requested, and was given, funds
for the appointment of two experts, but she asserts that she should have had additional expert
assistance, including an expert on choking such as a pediatric otolaryngologist, to "level the
playing field" with the State's experts. 

A. The Constitutional Right of an Indigent Defendant to Expert Assistance at Trial.

 In Ake, the United States Supreme Court held that due process may require that an
indigent defendant be granted access to expert assistance if "the expert can provide assistance
which is 'likely to be a significant factor' at trial." (22) Three interests must be balanced in
determining whether the State must provide such access:

 The first is the private interest that will be affected by the action of the State. 
The second is the governmental interest that will be affected if the safeguard
is to be provided. The third is the probable value of the additional or substitute
procedural safeguards that are sought, and the risk of an erroneous deprivation
of the affected interest if those safeguards are not provided. (23)


This analysis is conducted with a view towards whether failing to provide the defendant with
the expert help he claims is necessary creates "a high risk of an inaccurate verdict." (24) 

 However, the State need not "purchase for an indigent defendant all the assistance
that his wealthier counterparts might buy." (25) Nor is a defendant entitled to choose an expert
of his own personal liking or one who will agree with his defense theory. (26) A defendant does
not have a due-process right to "'shop' for experts-at government expense-until he unearths
a person who supports his theory of the case." (27) But if the defendant makes a sufficient
threshold showing of the need for expert assistance on a particular issue, the defendant is
entitled to access to at least one expert, (28) who, even if he cannot or will not testify to the
defense's theory of the case, is "available to consult with counsel, to interpret records, to
prepare counsel to cross-examine State's witnesses, and generally to help present appellant's
defense in the best light." (29) The question in each case is "how important the scientific issue
is in the case, and how much help a defense expert could have given. . . . The nature of an
expert's field and the importance and complexity of the issue will bear directly upon whether
the appointment of an expert will be helpful." (30)

 If the trial judge appoints an expert, and the defendant requests another or a different
expert, the trial judge may deny further expert assistance unless the defendant proves that the 
original appointed expert could not adequately assist the defendant. (31) The Constitution does
not entitle "a defendant to the best (or most expensive) expert, or to more than one expert if
the first does not reach a conclusion favorable to the defense. Just as a defendant who relies
on counsel at public expense must accept a competent lawyer, rather than Clarence Darrow, 
so a defendant who relies on public funds for expert assistance must be satisfied with a
competent expert." (32)

 The Supreme Court has stated that an indigent defendant is not entitled to the
appointment of experts when he offers "little more than undeveloped assertions that the
requested assistance would be beneficial." (33) He must provide concrete reasons for requiring
the appointment of any particular expert (34) As Professor LaFave notes,

 Courts uniformly stress that the showing of need must set forth in detail what
assistance is being requested and why it is needed. The defense must identify
the expert, explain what the expert will do, and explain why that will be
important in representing the defendant. (35)

Thus, courts have held that a trial judge does not err in denying funds for an appointed expert
if the defense fails to set out the name of the requested expert in his motion, why the expert
is necessary in the particular case, and the approximate cost of appointing that expert. (36) 
Article 26.052(f) and (g) (37) speak to this specificity requirement in the context of advance
funding for appointed counsel for investigation of potential defenses in capital cases, but
there is no separate statute for noncapital cases.

B. Factual Background to Applicant's Ake Claim.

 In his first habeas affidavit, applicant's lead trial counsel explained the composition
of the defense team as consisting of himself; second-chair counsel; a third counsel who
joined the team shortly before trial; the defense investigator and his assistant; Dr. Ira Kanfer;
Dr. George Parker, a psychologist; and Keith Kristelis, another expert who was experienced
in graphics and simulation. Counsel explained that he "would have liked to have been able
to afford Dr. McGeorge, (38) [as well as] experts in biomechanical engineering, human factors
research, and child development, but the willingness of people contacted to take appointed
cases and the fee in the tens of thousands of dollars were beyond our limited resources." 
There is nothing in trial counsel's first affidavit that suggests that he had requested further
monetary assistance from Judge Wisser, the trial judge, or that the judge denied any such
request.

 The trial record does show that applicant's trial counsel was able to obtain monetary
assistance from the trial judge when he filed written motions requesting such assistance. On
June 13, 2003-six months after applicant's arrest-Judge Wisser granted applicant funds for
the appointment of an investigator. He granted additional investigative funds on October 1,
2004. On January 16, 2004, Judge Wisser, "after considering the evidence and argument of
counsel," signed an order approving funds for applicant to retain an expert in forensic
medicine. Several months later, trial counsel wrote a letter to the prosecutor informing her
that he had retained Dr. Kanfer whom he had found "through Dr. Henry Lee (of the O.J.
case). . . . He is a forensic pathologist. He was the expert in the Boston Nanny case. (39) . . . Dr.
Kanfer is even willing for you to depose him, assuming that Judge Wisser will allow him to
be paid for it. . . . We have a tragic accident and I think that Dr. Kanfer might be able to shed
some light." A few days before trial, Judge Wisser signed another order, granting applicant's
"Sealed Ex parte Motion for Approval of Expert Witness," approving funds for "Keith
Kritselis of Ichabod.com for simulation, animation, and demonstrative evidence." There is
nothing in the trial record that shows that the trial judge denied any Ake motions or other
requests for monetary assistance to retain experts. (40)

 Applicant's initial habeas application did not contain any Ake claim. It was only when
she filed a supplement to that application that she raised an Ake claim and attached a new
affidavit from trial counsel in which he stated,

 During my pre-trial preparations, I met with Judge [Wisser] to ask for
additional funds to retain experts such as Dr. McGeorge and a biomechanical
expert. I explained to the judge why we needed these experts, and I did not
think that my current team was adequate to counter the State's case. Judge
[Wisser] told me that he had authorized more experts than usual in a non-capital case, and that he would not pay for any more expert assistance
regardless of my need. Based on the judge's ruling, I was forced to work
within the constraints imposed by the Court. Ms. Jimenez was indigent, and
I could not afford to hire these experts out of pocket.


There is nothing in the trial record that reflects this conversation. And there is nothing in
either the trial or habeas record that shows when this conversation occurred. This is a critical
omission because the reasonableness of a trial judge's denial of an Ake motion depends upon
the specific information that the trial judge had in front of him at the time that he denied that
motion. (41) Further, applicant did not include any such assertions or evidence supporting her
Ake claim in her motion for new trial. And she did not raise this issue on direct appeal. 

C. May an Ake Claim Be Considered When It Is First Raised in a Post-Conviction
Writ of Habeas Corpus?


 We ordered the parties to brief a threshold issue to determine whether applicant could
raise her Ake claim for the first time in an application for a writ of habeas corpus. Ordinarily
a convicted person may not raise an issue in a habeas proceeding if the applicant could have
raised that issue on direct appeal. (42) Even constitutional claims are "forfeited if the applicant
had the opportunity to raise the issue on appeal. This is because the writ of habeas corpus
is an extraordinary remedy that is available only when there is no other adequate remedy at
law." (43) Indeed, we recently noted our "trend. . . to draw stricter boundaries regarding what
claims may be advanced on habeas" petitions because "'the Great Writ should not be used'
to litigate matters 'which should have been raised on appeal' or at trial[.]" (44) 

 Applicant admits that, under normal circumstances, a defendant must preserve an Ake
claim in the trial court and raise it on direct appeal. (45) This is because it is a record-based
claim-dependent upon a written motion and formal ruling-that must be made and resolved
before the trial begins. (46) Applicant claims that we should make an exception to that rule
because here "the record is not adequate to evaluate her Ake claim because of the established
informal practice of considering funding requests utilized by trial counsel and the Court." (47) 
According to trial counsel's second affidavit, his routine practice for implementing Ake
requests was to meet informally with the trial judge and explain his need for an expert.

 If the judge decided to authorize payment, I would then file a motion
requesting expert assistance that would simply state my need for the expert. 
This motion would be granted, as authorized in the prior ex parte conversation
in chambers. 

But Ake does not authorize such an informal methodology in seeking expert assistance, and
such an off-the-record informal meeting will not itself preserve a claim to the entitlement of
expert assistance for judicial review by the appellate courts in Texas either on direct appeal
or habeas review. The contemporaneous objection rule applies to Ake claims just as it
applies to other constitutional claims. (48) 

 Before an indigent defendant is entitled to appointment and payment by the State for
expert assistance, he must make a pretrial "preliminary showing" that is based upon more
"than undeveloped assertions that the requested assistance would be beneficial." (49) Thus, in
Texas, an indigent defendant will not be entitled to funding for experts absent adequate
factual support in the written motion that he presents to the trial judge.

 In cases holding that a sufficient showing was not made under Ake, the
defendant typically has failed to support his motion with affidavits or other
evidence in support of his defensive theory, an explanation as to what his
defensive theory was and why expert assistance would be helpful in
establishing that theory, or a showing that there was reason to question the
State's expert and proof. (50)

In Williams, we reiterated the importance of presenting affidavits or other information to the
trial judge in making the required threshold showing. (51) We held that the defendant is entitled
to present his motion and evidence in an ex parte hearing outside the presence of the
prosecutor to protect the defendant from disclosing his defensive theory to the State before
the trial has begun. (52)

 But a trial judge does not err in denying an informal, off-the-record request for
additional funding for experts when he is not presented with a written motion that contains
affidavits or other evidence that would support the defendant's request. (53) If Judge Wisser
had denied an informal, off-the-record request for additional funding for experts, applicant
could have preserved that constitutional issue by filing a formal motion ex parte with the
appropriate affidavits or information supporting the request before trial. Then she could have
raised that claim in her motion for a new trial or on direct appeal. But we cannot review the
merits of an Ake claim on either direct appeal or habeas review if the defendant failed to file
a proper pretrial Ake motion that the trial judge denied. In this case, applicant forfeited
consideration of her Ake claim on habeas review because she failed to preserve her
constitutional claim in the trial court by filing a proper written Ake motion and ensuring that
the trial judge formally ruled on it. (54) 

 We therefore deny relief on this claim.

III.


 Applicant also claims that she is entitled to a new trial based on her lead counsel's
ineffective assistance. Specifically, she asserts that her lead counsel was deficient because
(1) he hired Dr. Kanfer; and he failed to (2) object and request a mistrial and a continuance
in response to Dr. Kanfer's cross-examination testimony; (3) retain other qualified experts;
and (4) make a written request under Ake for retaining those experts. Applicant's counsel
refers to this case as a "failure of forensics" because of these four interrelated deficiencies. 
 In Strickland v. Washington, (55) the United States Supreme Court recognized a criminal
defendant's Sixth Amendment right to effective assistance of counsel because the "right to
counsel plays a crucial role in the adversarial system" and "access to counsel's skill and
knowledge is necessary to accord defendants the ample opportunity to meet the case of the
prosecution to which they are entitled." (56) A person claiming that counsel was ineffective
must prove, by a preponderance of the evidence, (1) that counsel's performance was
deficient, falling below an "objective standard of reasonableness," and (2) that the deficient
performance prejudiced the defense such that "there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different." (57)

 We "'indulge in a strong presumption that counsel's conduct [fell] within the wide
range of reasonable assistance,' and that 'the challenged action might be considered sound
trial strategy.'" (58) The mere fact that another attorney might have pursued a different tactic
at trial does not suffice to prove a claim of ineffective assistance of counsel. (59) The Strickland
test is judged by the "totality of the representation," not by counsel's isolated acts or
omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not
through 20/20 hindsight. (60)

A. Counsel's Qualifications and Preparation. 

 Lead counsel did not testify at any of the habeas hearings, but he did submit two
affidavits setting forth his qualifications, his strategy in this case, and explanations for his
tactics. Counsel stated that he has been in practice for "more than 28 years . . . with never
any disciplinary issue or finding of ineffectiveness." He is board certified in criminal law
and is on the appointed-attorney capital-murder list for Travis County. (61) He and his co-counsel, as well as his investigator, "undertook extensive interviews" with applicant and
made every attempt to talk to the witnesses who had knowledge of the case and of applicant's
character. Because many of the witnesses "aligned with the State" declined to talk to lead
counsel, he sent them letters almost a year before trial again asking them to talk with him. 
Not one of them responded. He and his team did speak to many witnesses who knew
applicant "as well as family in Mexico with the help of the Mexican Consulate." They
learned as much as possible "about child abuse, the most common types of abuse, and the
character traits of abusers." Their research included "treatises, articles, cases reported, and
speaking with experts," but they found no case of abuse similar to the present one. 

 "The theory of the [defense] case was that the child had accidentally swallowed the
paper towels and that the efforts to help the child aggravated the condition resulting in
complete occlusion of his airway for between 7 to 10 minutes. . . . The probable cause
affidavit, offense reports, our client's statement, our experts' opinions, medical records, etc.
were in many respects consistent with our theory." The defense planned to put on character
evidence to show that applicant was not the type of person who would abuse a child. They
worked with Dr. Parker, a psychologist, concerning applicant's mental state. 

 "The next part of the plan was to explain the accident with the testimony of Dr. Kanfer
and the demonstrative evidence of Mr. Kristelis. We would demonstrate how the accident
could have happened, which was consistent with the evidence and explained why the child
had no injury." Experienced counsel was not ineffective in his pretrial preparation and focus
upon the primary contested issue.

B. The Retention of Dr. Kanfer.

 Counsel stated that it was very hard to find an expert willing to accept the low pay of
an appointed case and "we do not have the type of funds that give us the luxury of getting
anyone we want. . . . Dr. Kanfer was willing to take the appointed case and worked very hard
to find the truth. He worked on this case for a year and did not even charge all his time." He
worked with Dr. Henry Lee (of the O.J. Simpson case) who had referred Dr. Kanfer to lead
counsel. "Dr. Kanfer worked numerous difficult cases and had extensive experience in
testifying." Dr. Kanfer had worked as a medical examiner for the State of Connecticut for
almost twenty years by the time of trial. He had testified as an expert witness about 350
times. In the hearing outside the jury to qualify Dr. Kanter as an expert witness, the trial
judge concluded that "in all candor, obviously, this gentleman's going to be able to
testify. . . .I mean, this isn't a close call so-it should be apparent to everyone." 

 Dr. Kanfer's direct testimony clearly and cogently laid out the scientific and medical
basis for his opinion that B.G.'s choking was accidentally caused by the toddler's act of
wadding up the paper towels and stuffing them into his own mouth. Dr. Kanfer had even
conducted an experiment to show how that could have occurred. Nowhere does applicant
find fault with the direct testimony of Dr. Kanfer, the content of his opinions, or the scientific
basis for those opinions.

 Indeed, applicant acknowledges that "Dr. Kanfer's opinions were generally sound and
supportive of her case," (62) but she complains about his lack of pediatric training. Dr. Kanfer
may not have been a specialist in pediatric forensic pathology, but trial counsel concluded
that he had some pediatric experience, both as an expert in the "Boston Nanny" case and
because he filed a motion for continuance shortly before the trial was originally scheduled
in September of 2004, asking for additional preparation time and noting that "Counsel is not
ready in that he has just very recently gotten an expert to aid in the case. There were several
difficulties in finding and employing an expert with experience in pediatrics." The trial was
postponed for almost a full year, during which time counsel worked with Dr. Kanfer, who,
as counsel stated, had some experience in pediatrics. A forensic pathologist like Dr. Kanfer
(and Drs. Peacock and Parangao who testified at trial) is ideally situated to determine the
cause and manner of death in suspicious circumstances. That is what pathologists do. Dr.
Peacock testified that "the discipline of forensic pathology is a discipline where common
sense meets science and we utilize both articles that are written with their statistical
probabilities and we use common sense." We have noted that "[c]ausation or mechanism of
death are examples of important medical questions addressed by pathologists that require
more than an objective or rote determination." (63) Counsel was not, therefore, ineffective for
retaining Dr. Kanfer.

C. Trial Counsel's Failure to Request a Mistrial or Continuance in Response to Dr.
Kanfer's Use of Profanity.

 The real problem that applicant notes (and the habeas judge found) was in Dr.
Kanfer's unfortunate remark, including an expletive verb, to the lead prosecutor in the
hallway during a break in the proceedings and the prosecutor's repeated references to that 
remark in front of the jury. (64) This was an infelicitous incident and probably quite damaging
to Dr. Kanfer's credibility as a neutral scientific expert. However, trial counsel had done his
best to prepare Dr. Kanfer for the prosecutor's aggressive and confrontational style. Counsel
stated that he was well aware of both the prosecutor's penchant for attacking defense
witnesses and the trial judge's willingness to give the attorneys leeway in their questioning: 

 We knew [she] would attack our expert. We calculated that if Dr. Kanfer
could withstand the attack, it would hurt the State. I also felt that if I tried to
protect the witness he would lose credibility. . . . No one regretted the
exchange between Dr. Kanfer and [the prosecutor] more than Dr. Kanfer
himself. He had been prepared and knew what to expect and was supposed to
be ready to handle it. Some judges would never have allowed some of the
prosecutors' tactics, objection or no objection, but I knew Judge Wisser would,
that is why Dr. Kanfer was prepared.


We conclude that counsel's belief was reasonable under the circumstances as Dr. Kanfer was
an experienced forensic pathologist who had testified in some 350 trials. Applicant does not
explain how lead counsel could have, or should have, known that Dr. Kanfer would "blow
up" at the prosecutor in the hallway.

 Applicant also asserts that, after Dr. Kanfer's outburst, lead counsel should have asked
for a continuance or a mistrial because of this "highly prejudicial conduct." But applicant
does not explain the legal basis for such a request, other than to say counsel "failed to act
appropriately." But what was he supposed to do? The trial judge overruled his objection,
and the court of appeals held that the prosecutor was entitled to refer to the hallway colloquy
to show Dr. Kanfer's bias against the prosecutor and the State's position. (65) And the
correctness of those legal rulings is not before us in this habeas proceeding.

 Counsel explained his strategy in not always objecting to the prosecutor's sarcasm,
sidebar remarks, and "mistreatment of defense witnesses": (66)

 It was my decision based on what I thought was an outlandish theory by the
State to give [the prosecutor] a great deal of leeway as I thought her behavior
would alienate a jury and combined with an outlandish theory would enure to
our benefit. We knew, and it is basic, that if you attack a witness, who is not
a party, juries do not like it.

 . . .

 [Counsel's strategy] was considered after trial counsel had received
feedback from prior jurors who completely disliked her and her sarcastic,
mean-spirited approach. It was determined that we would allow her some
freedom to be[] herself.


Given these considerations, trial counsel's strategy was not unreasonable. First, the
reasonableness of his decision to retain and call Dr. Kanfer as an expert witness must be
assessed at the time counsel retained Dr. Kanfer and at the time he called him to the witness
stand-not at the time Dr. Kanfer used an expletive during a break in the proceedings. (67) 

 Second, in this case, unlike the two cases applicant cites in her brief, (68) Dr. Kanfer was
clearly competent to testify to applicant's theory of B.G.'s cause of death, and he testified on
direct examination exactly as predicted and anticipated.

 Third, a reasonable attorney could not have been expected to predict that, despite
defense counsel's warning about the prosecutor's aggressive style, his experienced expert
would make profane remarks during a break. 

 In hindsight, counsel clearly should not have let Dr. Kanfer come anywhere near the
prosecutor during any breaks, but that single failure does not make counsel ineffective. In
sum, trial counsel's performance in retaining Dr. Kanfer and calling him as an expert witness
was not deficient.

 Furthermore, counsel was not deficient for failing to ask for a mistrial or continuance.
A mistrial is "a remedy appropriate for a narrow class of highly prejudicial and incurable
errors." (69) But applicant has failed to show that there was any error in the prosecutor
impeaching Dr. Kanfer with his inappropriate remark to show his bias. Indeed, the trial
judge overruled counsel's objection to this line of questioning, so he clearly would not have
granted a mistrial or continuance if counsel had requested one. (70) The failure to object to
proper questions and admissible testimony (and the failure to request a mistrial or
continuance based upon that questioning) is not ineffective assistance. (71)

D. The Failure to Retain or Request Funding for Additional Experts.

 Applicant asserts that her trial defense team-a team composed of three lawyers, two
investigators, and two expert witnesses-retained with funding approved by the trial judge and
paid for by the State, was inadequate. She states that she has now found Dr. Zur (an expert
in accidental choking), Dr. McCloskey (an expert in pediatric critical care anesthesiology and
general pediatrics with training in child abuse), and Dr. Ophoven (an expert in pediatric
forensic pathology), and that they could have testified at the time of trial as a
"multidisciplinary team." Indeed, they might have been able to, but that is not the issue. It
is certainly true that this trial was not a perfectly "level playing field" in terms of the number
of expert witnesses on each side. 

 In an ideal world, it might well be wise to have an equal number of experts on each
side of a lawsuit, each one matching the skill and experience of his opposing expert. 
Applicant makes a compelling argument that she was outclassed and outmatched by the
State's numerous experts. But the issue before us is whether the constitution requires that
an indigent defendant be provided with an absolute (or even rough) equivalency of experts
when the primary contested issue at trial involves the cause of death. We cannot find that
Ake stretches that far. Instead, we must conclude that applicant does not have a
constitutional right to a "team of experts" paid for by the taxpayers, and applicant's counsel
is not ineffective in failing to request such a team.

 The issue is whether counsel's failure to hire (or to request the trial judge to appoint
and provide funding for) additional experts created "a high risk of an inaccurate verdict." (72)
This case depended, in large part, upon medical forensics and the question of whether B.G.
could have accidentally stuffed the wad of paper towels into his mouth by himself or whether 
someone else-presumably applicant-must have done so. Applicant was clearly entitled to
access to an expert who could speak knowledgeably on that question to build an effective
defense, but she has not shown that the failure to have additional experts, beyond Dr. Kanfer,
to address that question created "a high risk of an inaccurate verdict." (73) 

 The additional experts that applicant has now produced are perhaps even more
qualified than Dr. Kanfer, but she has not shown how their testimony would be significantly
different or more persuasive than was Dr. Kanfer's. They reached exactly the same ultimate
opinion as Dr. Kanfer and for almost precisely the same reasons. Applicant implies that
because a "multidisciplinary team of experts (including three pediatric specialists) testified
for the State," she was entitled to a similar team. First, the State called two treating
doctors-not retained experts-to testify to the facts they observed and the care that they
provided to B.G. Their opinions concerning the cause of his death were based upon their
first-hand involvement with the toddler; the State did not retain them as part of a
multidisciplinary team of testifying experts. So far as we can tell from the record, Dr.
Alexander was the only expert specifically retained by the State. Second, Ake does not
require the appointment of a defense expert to match every State expert. Ake ensures that an
indigent defendant has access to at least the "basic tools" of a defense, but applicant cites no
case from any jurisdiction that states that an indigent defendant is entitled to multiple experts
to testify to the same ultimate opinion on the same topic or that such a defendant is entitled
to match the State expert for expert. 

 Applicant's counsel was not ineffective for failing to file a written Ake request for
additional funding to retain more experts to testify on the defense theory that B.G. could have
crumpled up the paper towels by himself, stuffed that wad into his mouth, and accidentally
choked on it. The defensive theory, buttressed by Dr. Kanfer's testimony, was cogently,
coherently, and completely presented to the jury. Additional defense medical experts would
surely have been helpful, but they were not constitutionally required. Applicant has not
shown that, if his attorney had retained (or requested funding for) more experts to testify to
the same theory, the result of the trial likely would have been different. (74) 

 We therefore conclude that counsel was not ineffective under the Strickland standard.

IV.


 Because we conclude that applicant has failed to prove, by a preponderance of the
evidence, any of the claims set out in either her original or supplemental application for a
writ of habeas corpus, we deny relief.


Delivered: April 25, 2012

Publish
1. Jimenez v. State, 240 S.W.3d 384 (Tex. App.-Austin 2007, pet. ref'd).
2. The habeas judge was not the judge at the original trial.
3. 470 U.S. 68 (1985).
4. Ex parte Reed, 271 S.W.3d 698, 727-28 (Tex. Crim. App. 2008).
5. Jimenez, 240 S.W.3d at 397-98.
6. The State also relied on applicant's "private" talk with Officer De Los Santos in which
she asked if she could speak with him "as a friend" outside the police station. Unbeknownst to
applicant, the officer recorded this conversation in which applicant asked, "If I were to tell you
that I did it, what would happen?" She also asked the officer about how long she could go to
prison, to which Officer De Los Santos replied that he did not know. 
7. The paramedic who had removed the "wad" after several unsuccessful attempts, stated
that, in a photograph taken about an hour and a half later, the wad appeared to have dried out a
little and expanded. At the time he pulled it out of B.G.'s throat, it was the size of a large egg,
about 3 inches long and close to 3 inches wide. The paramedics immediately "bagged" the wad
and gave it to police because they suspected that it was evidence of a potential crime.
8. The defense argued that this scenario could not be accurate because B.G. had no other
injuries, bruises, or scrapes on his body, and applicant had only a small bite mark on her hand
where B.G. had bitten her as she tried to pull the wad out of his mouth when she first saw his
distressed breathing.
9. A roll of paper towels was found on the sofa in applicant's living room. Applicant told
the police that both B.G. and her daughter had runny noses that day. She used a paper towel to
wipe B.G.'s nose, then left the roll on the sofa, and went into the kitchen to cook. She noticed
that both B.G. and her daughter were playing with the paper towels, tearing sheets from the roll
and throwing them. She told the children to stop playing with the towels, but they continued to
do so. She saw B.G. go into the bedroom, leaving the roll of towels on the sofa. Applicant
called to B.G. to come back where she could see him because she did not want him playing in the
bathroom and putting his hands in the toilet bowl. When B.G. came toward her, he was "walking
very slowly" with his hand on his throat. He was very red, but when she asked him what was
wrong, he did not answer. She saw him choking on something, so she took him into the
bathroom, squeezed his cheeks together, tried to put her fingers in his mouth to see what was
wrong, and hit him on the back in an effort to dislodge the obstruction. When she could not get
the object out of his mouth, she picked him up and ran over to her neighbor's house for help. 
She said that only a minute or two had elapsed from the time she first saw B.G. choking until she
took him to the neighbor's apartment.
10. Dr. Peacock did not perform B.G.'s autopsy; she reviewed the autopsy report written by
Dr. Vladimir Parungao. The defense called Dr. Parungao in its case to impeach his credibility
and attack his autopsy finding that B.G.'s death was a "homicide." 
11. Dr. Kanfer also noted that, because applicant was seven months pregnant, she would
likely have a difficult time holding a toddler tight enough to force the wad down his throat. Dr.
Oehring, on the other hand, had testified that doctors routinely restrain small children in the ICU
without bruising their patients and that she had seen many children who were murdered without
any bruises being left on the skin. 
12. Dr. Oehring had previously testified that B.G. did not have pulmonary edema, and Dr.
Boulet had said that he did not think that the blood on the towel wad was consistent with
pulmonary edema. The State's theory was that the blood on the towels resulted from applicant's
act of forcing the wad down B.G.'s throat, while the defense theory was that the blood resulted
from pulmonary edema regardless of how the towels came to be lodged in B.G.'s throat.
13. Applicant told police that she scooped up B.G. and ran to the neighbor's within a
minute or two of seeing him choking. The State's theory was that she did not take B.G. over to
the neighbors for "probably 30 to 40 minutes" after he had been deprived of oxygen. 
14. After Dr. Alexander's testimony, the defense recalled Dr. Kanfer to further explain his
views. However, this proved to be counterproductive. As the court of appeals stated, "[a]t some
point during a break in Dr. Kanfer's testimony and outside the presence of the jury, Dr. Kanfer
apparently made a rather contemptuous comment about the prosecutors, which included the use
of a profane verb." Jimenez, 240 S.W.3d at 403. During her second cross-examination of Dr.
Kanfer, the prosecutor brought this incident to the jury's attention three different times:

Q: And you're just here as a completely unbiased expert to educate the jury.

A: Exactly.

Q: Is that why on the break you made the statement that they, referring to Mr. Cobb and
myself, could go [expletive] ourselves?

A: Right. That's an exactly correct quote.

Later, the State asked,

Q: Do you remember that you made the statement that Mr. Cobb and I could [expletive]
ourselves before I ever asked you about money? Do you remember that?

A: I don't know when I made the statement that--that you could both [expletive] yourselves,
but I definitely made the statement.

Q: Okay. Yeah, you definitely did.

A: Yeah.

Q: Is that something that you routinely do when you go out of state to testify as an expert
witness?

 Defense counsel then objected to the State "getting into the personal thing any more."
The prosecutor responded that the question was relevant to the issue of Dr. Kanfer's bias, and the
trial judge overruled the objection. At the end of her cross-examination, after the prosecutor
asked about Dr. Kanfer's disagreement with Dr. Alexander's opinions, the prosecutor said,

Q: But you're not angry at Dr. Alexander.

A: No, he's a nice guy.

Q: Okay. Well, then you don't want to tell him to go [expletive] himself.

A: No.

 The court of appeals concluded that the trial judge did not err in permitting this cross-examination because "Dr. Kanfer's admitted use of profanity when referring to the prosecutors
revealed potential animosity toward the prosecutors." 240 S.W.3d at 403. 
15. Jimenez, 240 S.W.3d at 401-02.
16. The habeas judge's extensive factual findings concerning Drs. Zur, McCloskey, and
Ophoven and their opinions take up six single-spaced pages. Those findings are based upon the
habeas record, and we agree with their overall accuracy.
17. The habeas judge concluded, in pertinent part,

3. The opinions of medical experts who have reviewed materials available at the time of
trial are not newly discovered evidence of the type that is sufficient to support an actual
innocence claim. Ex parte Briggs, 187 S.W.3d 458, 465 (Tex. Crim. App. 2005).

4. The expert opinions produced by Applicant do not constitute newly discovered evidence
under actual innocence jurisprudence because they rely on the same evidence as that
available at the time of trial. Applicant's experts have merely presented a differing
interpretation of the physical and medical evidence that existed at the time of trial.

5. Even if the opinions of Applicant's three experts had been sufficient to qualify as newly
discovered evidence, the applicant has not met her burden. Having examined the habeas
evidence against the trial evidence of guilt, this court finds Applicant has not shown by
clear and convincing evidence that no reasonable juror would have convicted her in light
of the habeas evidence. The evidence presented by the applicant's three experts is not
medically indisputable, but rather offers a differing view of the medical evidence from
that presented by the State.
18. These experts provided additional anecdotal evidence about other children who had
accidentally swallowed or choked on foreign objects, including a large wad of bread and a "super
ball." Dr. McCloskey "also testified that he did not find the inconsistencies in applicant's
statements regarding the injury to be evidence of child abuse. He testified that he has received
training in taking such histories and that a police officer would not have the level of training
needed to obtain a reliable medical history." Dr. Ophoven's affidavit stated that, based on her
experience in evaluating child abuse cases, she found "no relevant indicators of child abuse"
because B.G. had no "suspicious injuries" on his throat, mouth, or face, which he would have
had if someone had stuffed a wad of paper down his throat. She, like Dr. McCloskey, did not
find that the variations in applicant's statements indicated child abuse, but rather were "entirely
understandable in light of the crisis in which it was given, and the absence of any other indication
of child abuse."
19. For example, the habeas judge found that "Dr. Zur's credentials demonstrated that she
is one of the most qualified persons in the nation to give an opinion on this case. She was
extremely well versed in the anatomy and mechanism[s] of choking, and based her opinions on
this superior knowledge, training, and a complete review of all of the relevant medical
information in the case." He found that "Dr. McCloskey's credentials as [a] researcher and
clinician who is board certified in pediatrics, anesthesiology, and pediatric critical care as well as
his first-hand experience in treating both accidental choking cases and similar instances of child
abuse give him a unique perspective on the evidence that lends additional credibility to his
opinions regarding this injury."
20. Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).
21. 470 U.S. 68 (1985).
22. Id. at 74; see also Taylor v. State, 939 S.W.2d 148, 152 (Tex. Crim. App. 1996).
23. 470 U.S. at 77.
24. Busby v. State, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999) (per curiam).
25. Ake, 470 U.S. at 77.
26. Griffith v. State, 983 S.W.2d 282, 286 (Tex. Crim. App. 1998) (noting that "the
purpose of the appointment is to level the playing field; to give a defendant access to a competent
expert who can assist in the evaluation, preparation, and presentation of the defense.").
27. Taylor, 939 S.W.2d at 152.
28. Id.
29. DeFreece v. State, 848 S.W.2d 150, 161 n.7 (Tex. Crim. App. 1993).
30. Rey v. State, 897 S.W.2d 333, 338 (Tex. Crim. App. 1995) (citation and internal
quotation marks omitted).
31. Busby, 990 S.W.2d at 271 (trial judge did not commit Ake error by failing to appoint
drug-abuse expert when psychiatrist had been appointed and trial court "could have reasonably
found that [the psychiatrist] could adequately assist [the defendant] as a drug abuse expert with
regard to those issues [raised by the defendant]"
); Richards v. State, 932 S.W.2d 213, 215 (Tex.
App. --El Paso 1996, pet. ref'd) (Ake was not violated when trial judge appointed a Texas
psychologist rather than a California expert on post-traumatic stress disorder who "may have had
more impressive credentials" because the defendant failed to prove that the expert appointed was
incompetent to assist defendant on his PTSD-based defense).
32. United States v. Mikos, 539 F.3d 706, 712 (7th Cir. 2008) ("Abstract propositions about
entitlement to expert assistance go nowhere when the defendant had an expert," especially when
defendant failed to tell trial judge what a new expert could have done that original expert was
unable to do); see also Moore v. State, 889 A.2d 325, 339 (Md. 2005) ("It is clear that Ake does
not mandate handing over the State's checkbook to indigent defendants and their attorneys. The
Supreme Court reiterated that it has never 'held that a State must purchase for the indigent
defendant all the assistance that his wealthier counterpart might buy,' but had rather 'focused on
identifying the basic tools of an adequate defense or appeal.'") (quoting Ake; some internal
quotation marks omitted).
33. Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985).
34. See, e.g., Hansen v. State, 592 So.2d 114, 125 (Miss. 1991) (citing Ake).
35. 3 Wayne R. LaFave et al., Criminal Procedure § 11.2(e) at 654 (3d ed. 2007).
36. See, e.g., Johnson v. State, 529 So.2d 577, 591 (Miss. 1988) (noting "certain
requirements of specificity in the [Ake] motion . . . such as the name and specific cost for the
expert and the purpose and value of such an individual to the defense."). In State ex rel. Dressler
v. Circuit Court for Racine County, 472 N.W.2d 532 (Wis. Ct. App. 1991) (defendant failed to
make necessary showing of particularized need in his written requests for funding for expert
assistance), the Wisconsin court of appeals set forth a suggested process for an indigent
defendant's showing of particularized need for an appointed expert: 

 (1) Defendant shall make an ex parte application to the trial court for expert
assistance[;]

 (2) The application is reviewed in camera and sealed until resolution of the
pending charges[;]

 (3) The application contain a sufficiently plausible explanation showing: 
 (a) The requested expert will assist the defendant in the preparation of his
or her defense[;]

 (b) The materiality of the expert-material evidence is that evidence which
necessarily enters into the consideration of the controversy, and which by
itself or in connection with other evidence is determinative of the case[;]

 (c) The expert is not cumulative to other readily available witnesses[;] and, 

 (d) The expert is favorable to the defense. 

Id. at 540 n.12. This procedure is similar to that used in Texas courts. See note 37 infra.
37. Tex. Code Crim. Proc. art. 26.052(f) & (g). Paragraph (f) reads: "Appointed counsel
may file with the trial court a pretrial ex parte confidential request for advance payment of
expenses to investigate potential defenses. The request for expenses must state:
 (1) the type of investigation to be conducted;
 (2) specific facts that suggest the investigation will result in admissible evidence; and
 (3) an itemized list of anticipated expenses for each investigation."

Paragraph (g) reads: "The court shall grant the request for advance payment of expenses in whole
or in part if the request is reasonable. If the court denies in whole or in part the request for
expenses, the court shall:

 (1) state the reasons for the denial in writing;
 (2) attach the denial to the confidential request; and
 (3) submit the request and denial as a sealed exhibit to the record."
38. Counsel stated that he had consulted Dr. McGeorge who had appeared on "Good
Morning America" to talk about unusual children's choking accidents, including one child who
swallowed a table fork. 
39. The "Boston Nanny" case involved a young English au pair who was convicted of
"shaken baby" manslaughter in the death of an eight-month-old child she was babysitting. See
http://en.wikipedia.org/wiki/Louise_Woodward_case.
40. The State attached an affidavit from Judge Wisser to its objections to the habeas
judge's findings of fact. The State argues that it could not have submitted its objections or Judge
Wisser's supporting affidavit to the habeas judge because that judge signed his findings on the
very last day of his judicial office. The habeas record was then transmitted to this Court. 
Although we could remand this case for further proceedings and consideration of Judge Wisser's
affidavit, that is not necessary to our resolution of applicant's claims.
41. See, e.g., Moore v. Kemp, 809 F.2d 702, 710 (11th Cir. 1987) (rejecting defendant's
habeas claim that the trial judge erred in denying his Ake motion based on the materials he had
before him at the time of his ruling; "we must assess the reasonableness of the trial judge's action
at the time he took it. This assessment necessarily turns on the sufficiency of the petitioner's
explanation as to why he needed an expert. That is, having heard petitioner's explanation, should
the trial judge have concluded that unless he granted his request petitioner would likely be denied
an adequate opportunity fairly to confront the State's case and to present his defense?"); Conklin
v. Schofield, 366 F.3d 1191, 1208 (11th Cir. 2004) ("In determining the reasonableness of the
trial court's refusal to provide independent expert assistance, we consider only the facts available
to the trial judge when he made a ruling on the particular motion"); State v. Moore, 364 S.E.2d
648 (N. C. 1988) ("In determining whether the defendant has made the requisite showing of his
particularized need for the requested expert, the court should consider all the facts and
circumstances known to it at the time the motion for psychiatric assistance is made.") (internal
quotation marks omitted).
42. See Ex parte Nelson, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004) ("We have said
countless times that habeas corpus cannot be used as a substitute for appeal, and that it may not
be used to bring claims that could have been brought on appeal."); Ex parte Goodman, 816
S.W.2d 383, 385 (Tex .Crim. App. 1991) (it is well settled "that the writ of habeas corpus should
not be used to litigate matters which should have been raised on direct appeal."); Ex parte
Bagley, 509 S.W.2d 332, 334 (Tex. Crim. App. 1974) ("We, therefore, hold that the
contemporaneous objection rule serves a legitimate State interest in this question, and that the
failure of petitioner, as defendant, to object at the trial, and to pursue vindication of a
constitutional right of which he was put on notice on appeal, constitutes a waiver of the position
he now asserts" in an application for habeas corpus relief).
43. Ex parte Townsend, 137 S.W.3d 79, 81-82 (Tex. Crim. App. 2004).
44. Ex parte Richardson, 201 S.W.3d 712, 713 (Tex. Crim. App. 2006).
45. Applicant's Brief at 30 ("Ordinarily an Ake claim can be considered on appeal because
the record will reflect a written motion requesting funds and an order denying those funds.").
46. See Moore v. Kemp, 809 F.2d at 710. ("[A]n indigent defendant who did not have the
assistance of an expert in preparing and presenting his case cannot be heard to complain about
his conviction on due process grounds unless he made a timely request to the trial court for the
provision of expert assistance, the court improperly denied the request, and the denial rendered
the defendant's trial fundamentally unfair.").
47. Applicant's Brief at 31.
48. See Ex parte Medellin, 280 S.W.3d 854, 860 (Tex. Crim. App. 2008) (Cochran, J.,
concurring) ("In Texas, we have a contemporaneous objection rule which requires all litigants to
make a timely request, claim, or objection or forfeit the right to raise that request, claim, or
objection after trial. This same rule applies in every jurisdiction in America. As the Supreme
Court explained over thirty years ago, the contemporaneous objection rule serves important
judicial interests in American criminal cases and deserves respect throughout the land."); see also
Wainwright v. Sykes, 433 U.S. 72, 88 (1977) ("A contemporaneous objection enables the record
to be made with respect to the constitutional claim when the recollections of witnesses are
freshest, not years later in a federal habeas proceeding. It enables the judge who observed the
demeanor of those witnesses to make the factual determinations necessary for properly deciding
the federal constitutional question.").
49. Williams v. State, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997) (quoting Caldwell v.
Mississippi, 472 U.S. 320, 323-24 n.1 (1985)).
50. Rey, 897 S.W.2d at 341.
51. Williams, 958 S.W.2d at 193-94. 
52. Id.
53. Id.
54. See Ex parte Medellin, 280 S.W.3d at 860 ("Texas courts have long followed the
Supreme Court's reasoning concerning the importance of the contemporaneous objection rule in
the fair, effective, and efficient operation of its state courts."). As the United States Supreme
Court has explained,

 The failure of the federal habeas courts generally to require compliance with a
contemporaneous-objection rule tends to detract from the perception of the trial of
a criminal case in state court as a decisive and portentous event. A defendant has
been accused of a serious crime, and this is the time and place set for him to be
tried by a jury of his peers and found either guilty or not guilty by that jury. To the
greatest extent possible all issues which bear on this charge should be determined
in this proceeding: the accused is in the court-room, the jury is in the box, the
judge is on the bench, and the witnesses, having been subpoenaed and duly sworn,
await their turn to testify. Society's resources have been concentrated at that time
and place in order to decide, within the limits of human fallibility, the question of
guilt or innocence of one of its citizens. Any procedural rule which encourages the
result that those proceedings be as free of error as possible is thoroughly desirable,
and the contemporaneous-objection rule surely falls within this classification.

Sykes, 433 U.S. at 90.
55. 466 U.S. 668 (1984).
56. Id. at 685.
57. Id. at 694.
58. Ex parte White, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004) (quoting Strickland, 466
U.S. at 689).
59. Ex parte Miller, 330 S.W.3d 610, 616 (Tex. Crim. App. 2009). 
60. See Ex parte Wellborn, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990); Strickland, 466
U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to
eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's
challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").
61. Counsel noted that he had tried "10 or more jury trials within the [past] 18 months
alone." He listed some of the them as a capital murder trial, four homicides, an aggravated
robbery, aggravated kidnapping, and aggravated assault. He had submitted three appellate briefs,
and settled numerous other felony cases. 
62. Memorandum in Support of Supplemental Application at 41.
63. Rey v. State, 897 S.W.2d 333, 338 (Tex. Crim. App. 1995).
64. See supra note 14.
65. Jimenez, 240 S.W.3d at 403 (citing London v. State, 739 S.W.2d 842, 846 (Tex. Crim.
App. 1987) ("The State is clearly entitled to show any bias a defense witness might have against
the State or the prosecutor.").
66. Applicant raised several issues about the prosecutor's tactics on appeal, but the court of
appeals noted that "the prosecutor's sarcasm in this case was not directed at the defendant
personally," and it held that her conduct did "not rise to a level that it 'so infected the trial with
unfairness as to make the resulting conviction a denial of due process.'" 240 S.W.3d at 411-12.
67. Strickland, 466 U.S. at 690 ("A fair assessment of attorney performance requires that
every effort be made to eliminate the distorting effects of hindsight, to reconstruct the
circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's
perspective at the time."); see also Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) ("Ineffective-assistance-of-counsel claims will be raised only in those cases where a defendant has been found
guilty of the offense charged, and from the perspective of hindsight there is a natural tendency to
speculate as to whether a different trial strategy might have been more successful."); Ingham v.
State, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984) (when determining the validity of an
ineffective assistance of counsel claim, any judicial review must be highly deferential to trial
counsel and avoid "the distorting effects of hindsight").
68. Applicant cites Turpin v. Bennett, 525 S.E.2d 354, 355 (Ga. 2000) (counsel was
ineffective in putting psychiatrist who had AIDS dementia on witness stand when he knew
psychiatrist, who looked "deathly ill," was physically and mentally disabled; witness became
incoherent and irrational and jury "laughed out loud at his testimony"), and Skaggs v. Parker,
235 F.3d 261, 273 (6th Cir. 2000) (although attorneys were not ineffective for failing to
investigate fraud artist who claimed to be a psychiatrist before trial and for sponsoring his
testimony at guilt stage (he "was awful. He was incoherent. He was talking about things that
didn't make sense. You couldn't stop him. You couldn't reel him back in. People in the
audience were laughing at him."), they were ineffective for recalling him during retrial
punishment hearing when they knew, by then, he was incompetent and incoherent), but in each of
those cases, defense counsel were clearly on notice as to the serious mental deficiencies of the
expert before calling them to the witness stand. The same is not true in this case. Dr. Kanfer
testified exactly as anticipated on direct examination and throughout the first cross-examination
session.
69. Wood v. State, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).
70. Judge Wisser, the judge present in the courtroom and most attuned to the tone of the
questions asked and responses given, was in the best position to decide whether this line of
questioning required either a mistrial or a continuance. Having overruled defense counsel's
objection, he had determined that the questioning was permissible and thus no remedial action
(such as an instruction to disregard) was necessary, much less the more extreme remedy of a
continuance or mistrial. A trial judge may grant a continuance when a fair trial becomes
impossible due to an unexpected occurrence during trial. Cooper v. State, 509 S.W.2d 565, 567
(Tex. Crim. App. 1974). Applicant has failed to show what a continuance would have achieved
as there has been no showing that counsel could have found, retained, and sponsored another
expert to supplement Dr. Kanfer's testimony within a reasonable amount of time. See Rische v.
State, 746 S.W.2d 287, 290 (Tex. App.-Houston [1st Dist.] 1988, no pet.) (recently deceased
crime-reconstruction expert's opinion testimony was not sufficiently "material" to defense to
warrant mistrial or indefinite continuance to locate new expert; defendant elicited same expert
opinion from State's expert that his own expert would have offered, so testimony of another
expert would have been merely cumulative; noting that "if an applicant for a continuance . . .
does not present evidence to the court that indicates a probability that a substitute [witness] can
be secured or that the continuance will not result in an indefinite delay, the motion may be
properly denied.").
71. See, e.g., Ex parte White, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004) (defense counsel
is not ineffective for failing to object to admissible evidence); Muniz v. State, 851 S.W.2d 238,
258 (Tex. Crim. App. 1993) (the failure to object to admissible evidence is not ineffective
assistance of counsel); Weinn v. State, 281 S.W.3d 633, 641 (Tex. App.-Amarillo 2009) ("The
failure of appellant's counsel to request a mistrial could only be termed an act of ineffective
assistance of counsel if a mistrial should have been granted."), aff'd on other grounds 326
S.W.3d 189 (Tex. Crim. App. 2010).
72. Ake, 470 U.S. at 77 (State must ensure that an indigent defendant "has access to the raw
materials integral to the building of an effective defense," but "the State need not "purchase for
an indigent defendant all the assistance that his wealthier counterparts might buy,"); Busby v.
State, 990 S.W.2d 263, 271 (Tex. Crim. App.) (per curiam) ("The key question [under Ake]
appears to be whether there is a high risk of an inaccurate verdict absent the appointment of the
requested expert.").
73. Id.
74. Ake, 470 U.S. at 77.